In re The CARA CORPORATION,
Debtor.

The CARA CORPORATION, Plaintiff,

v.

CONTINENTAL BANK, Defendant.

Bankruptcy No. 90–15397S.
Adv. No. 91–1084S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 23, 1992.

Melvin Lashner, Philadelphia, PA, for debtor.

Andrew N. Schwartz, Philadelphia, PA, for Creditors' Committee.

Alan Gershenson, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Continental Bank.

Lewis Kates, Philadelphia, PA, special counsel to the debtor.

Andrea J. Pollack, New York City, for Irving Safra and Solomon R. Pollock.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

CONTINENTAL BANK ("the Bank"), the Defendant in this lender-liability action

brought by THE CARA CORPORATION ("the Debtor"), has filed a Motion seeking the entry of Summary Judgment in its favor ("the Motion"). The gravamen of this proceeding is the Debtor's claims that the Bank, the Debtor's major source of funding, failed to disclose to the Debtor that A.J. Wood Corp. ("Wood"), a large customer of the Debtor which was also a customer of the Bank, was in financial distress and that, as a result, the Debtor continued to do business with Wood to its financial disadvantage. The Debtor also alleges that the Bank profited financially due to the Debtor's continuity of business with Wood and hence at the expense of the Debtor.

We conclude as follows: (1) The lack of involvement of the Bank in the financial affairs of the Debtor negates the Debtor's claim that a fiduciary relationship existed between it and the Bank; (2) There is no evidence of any active misrepresentations by the Bank of Wood's financial condition or concealed knowledge of the Bank of fraudulent actions of Wood which might have given rise to liability of the Bank to the Debtor despite the absence of a fiduciary relationship between the two; (3) As a result, the Debtor is unable to withstand the Bank's Motion and its Complaint must be dismissed.

In light of this ruling, being cognizant that success in this proceeding is the linchpin of the Debtor's outstanding Fourth Amended Plan of Reorganization ("the Plan"), we are scheduling a status conference in this case on November 4, 1992, prior to November 30, 1992, the scheduled date of, *inter alia,* the trial of this proceeding and the date of a continued confirmation hearing in reference to the Plan.

## B. HISTORY OF THE CASE

The Debtor filed the underlying voluntary Chapter 11 bankruptcy case on December 28, 1990. On January 4, 1991, the Debtor moved to "stay enforcement" of the Bank's security interest supporting its claim of about $250,000 against the Debtor on the grounds that (1) it had not had the Debtor execute a new security agreement in connection with the most recent loan,

relying instead on the validity of a security agreement executed in connection with a prior, liquidated loan; and (2) the Bank was liable over to the Debtor in an amount in excess of its claim as a result of the Counterclaims arising from the lender-liability proceeding presently before us, which had been commenced on May 18, 1990, and was then pending in the Court of Common Pleas of Philadelphia County ("the CCP"). The Debtor demanded a jury trial in this proceeding when it was filed.

The Bank responded by opposing this motion and by filing a motion of its own, on January 14, 1991, to enjoin the Debtor from using the Bank's cash collateral. At the close of a hearing of January 24, 1991, we expressed skepticism about the merits of the Debtor's position that the Bank did not have a valid security interest and its contention that it could use the Bank's cash collateral without an Order of this court. Accordingly, the Debtor and the Bank negotiated a temporary cash collateral agreement which has been periodically renewed through November 30, 1992. This truce has, however, remained uneasy. The instant proceeding attacking the Bank's claim on the basis of lender liability remains unresolved. Also, the Debtor has filed an Objection ("the Objection") to the Bank's secured claim, in which it continues to argue, despite this court's expressed skepticism, that its failure to execute a renewed security agreement when the most recent loan was made renders the Bank's security interest invalid. The hearing on the Objection has also been carried over to November 30, 1992, along with the hearing to consider renewal of cash collateral and confirmation of the Plan.

In filings of February 15, 1991, the Debtor also challenged the constituency, and the choice of counsel of, the Official Unsecured Creditors' Committee ("the Committee") appointed in the case. Specifically, the Debtor attacked the presence of Robert Borsari, a former sales representative of the Debtor whom the Debtor claimed had violated certain conditions of his employment contract in taking a similar position with a competitor, as chairman of the Committee. Counsel for the Committee was

challenged because certain members of counsel's firm had recently left the firm of the Debtor's counsel under terms which resulted in hard feelings and pending litigation. The Objection to the Committee's counsel was withdrawn when it was agreed that the members of the firm of counsel to the Committee with which the Debtor's counsel was having a dispute would not participate in this case. Borsari was allowed to remain on the Committee by our Order of April 3, 1991.

On April 1, 1991, the Debtor filed a proceeding, Adversary No. 91–0222S, seeking monetary damages against Borsari and his new employer for breach of Borsari's employment contract with the Debtor ("the Borsari Case"). Shortly thereafter, the Debtor also filed its initial Plan of Reorganization on April 16, 1991.

Meanwhile, the instant proceeding was removed from the CCP to the district court by the Debtor on February 13, 1991.[1] On February 22, 1991, Lewis Kates, Esquire, who apparently had been working on this proceeding while it was in the CCP, was appointed as the Debtor's special counsel to continue to pursue the proceeding. The proceeding was ultimately transferred to this court, while the parties were in the midst of discovery, by apparent agreement of the parties and Order of the district court of November 26, 1991.

While the Debtor still remains in its business of computer processing and software development at a sharply-reduced level from its pre-bankruptcy state, it soon became obvious that its principal means of funding a plan were with the anticipated proceeds of its two pending pieces of major litigation: the Borsari case and this proceeding. In fall, 1991, with significant assistance from the Honorable Judith H. Wizmur of the District of New Jersey, the Borsari Case was settled by an agreement

of the Defendants to pay the Debtor $75,-000.

However, the differences between the Debtor and the Committee resurfaced over the issue of how the instant proceeding should be approached. On December 13, 1991, the Committee filed its initial competing plan of reorganization ("the Committee Plan"). The Committee Plan featured a settlement with the Bank whereby the Bank would agree to allow its claim to be reclassified as an unsecured claim. In its final form, the Committee Plan contemplated a dividend of about ten (10%) percent to all creditors, including the Bank, paid mostly from the proceeds of the settlement of the Borsari Case. By way of contrast, the Debtor's series of plans all contemplated litigation of the instant proceeding and payment of all creditors (including what would hopefully be slim, if any, remains of the Bank's claim) in full with the anticipated proceeds.

Hearings to consider Disclosure Statements accompanying the competing Plans of both the Debtor and the Committee and a status hearing on this proceeding were all scheduled on January 29, 1992. There, it was agreed by the parties that the Committee's Plan would first proceed to a confirmation hearing, since its confirmation would end both the proceeding and the Debtor's need to pursue a Plan. A confirmation hearing on the Committee's Plan was therefore tentatively scheduled on April 1, 1992, and status hearings on the Debtor's Plan and this proceeding were carried over to that date as well.

As it developed, the majority in number and amount of unsecured creditors voting rejected the Committee's Plan. The Committee nevertheless pressed for a hearing to attempt to cram down its Plan upon its own purportedly-unenlightened constituency. After briefing, we denied confirmation

---

1. Unfortunately, neither the parties nor the district court initially recognized that the removal of a proceeding under 28 U.S.C. § 1452(a) should be automatically referred to the bankruptcy court rather than remaining in the district court. *See* Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 9027(e)(1) (formerly F.R.B.P. 9027(f)(1)); and 1 COLLIER ON

BANKRUPTCY, ¶ 3.01[5][c], at 3–94 (15th ed. 1991). *Cf. In re Convent Guardian Corp.*, 75 B.R. 346, 347 (Bankr.E.D.Pa.1987) (even prior to enactment of F.R.B.P. 9027(e)(1), removal under 28 U.S.C. § 1452(a) was properly made to the bankruptcy court initially, not to the district court).

of this Plan on April 27, 1992, holding that the Committee was acting in violation of its fiduciary duties and, ultimately, of 11 U.S.C. §§ 1129(a)(3), 1129(b)(1) in attempting to cram down a plan rejected by the very body which it was appointed to represent. Our Order of April 27, 1992, published at 1992 WL 88189 (*"Cara I"*), also scheduled a status hearing on the Disclosure Statement accompanying the Debtor's Plan, on the Debtor's still-outstanding Objection to the Bank's security interest, and on this proceeding on April 29, 1992.

As a result of colloquies at the status hearings of April 29, 1992, we issued two Orders dated May 1, 1992. One related solely to the Debtor's then-outstanding Third Amended Disclosure Statement accompanying its Third Amended Plan of Reorganization. Therein, we sustained certain Objections to the Third Amended Disclosure Statement, but allowed the Debtor to file a corrective Fourth Amended Plan and Disclosure Statement by May 8, 1992. We also continued the hearing on the still-pending Objection to the Bank's secured status to the projected date of a hearing to consider confirmation of a Fourth Amended Plan on July 1, 1992.

In *Cara I*, slip op. at *2, we suggested that the Debtor may have waived its right to a jury trial in this proceeding by removing it to this court, citing *In re Hallahan*, 936 F.2d 1496, 1505–06 (7th Cir.1991); *Bayless v. Crabtree*, 108 B.R. 299, 304–05 (W.D.Okla.1989), *aff'd*, 930 F.2d 32 (10th Cir.1991); *In re Haile Co.*, 132 B.R. 979, 980–91 (Bankr.S.D.Ga.1991); and *In re Lion Country Safari, Inc. California*, 124 B.R. 566, 571–72 (Bankr.C.D.Cal.1991). Therefore, in our Order of May 1, 1992, relating to the instant proceeding, we provided, *inter alia*, as follows: (1) If the above-entitled proceeding was to be heard non-jury, it would be tried on October 5, 1992; (2) All discovery was to be completed by September 1, 1992, except as to expert witnesses on the issue of damages; (3) Any dispositive motion was to be filed and served on or before September 1, 1992, and answered on or before September 21, 1992; and (4) The parties were to address the issue of the Debtor's entitlement to a jury trial in Briefs filed on or before September 1, 1992 (Debtor), and September 21, 1992 (Defendant).

A Fourth Amended Disclosure Statement was filed and approved and a confirmation hearing on a Fourth Amended Plan was indeed scheduled on July 1, 1992. The Plan was accepted by most classes, although the Committee's counsel voted to reject the Plan and objected to the contingency of payment of its administrative claim, which was dependent on the outcome of this proceeding. The Bank also rejected and objected to the Plan, stating that the Plan failed to protect its secured claim. The Debtor ultimately agreed to carry over confirmation and the Objection to October 5, 1992, the established trial date of the proceeding.

We assumed that the parties would attend to the necessary discovery to meet the liberal deadlines established in the May 1, 1992, Order regarding matters related to the proceeding. On August 12, 1992, the instant dispositive Motion appeared, *before* the established deadline date for filing same of September 1, 1992. Recognizing that the Motion presented difficult issues which this court should resolve as expeditiously as possible with the looming October 5, 1992, trial date, we entered an Order of August 13, 1992, moving up the Debtor's response date to the Motion to September 8, 1992. When no Brief addressing the jury trial issue arrived as of September 1, 1992, we issued an Order of September 2, 1992, stating that we would deem the jury demand waived if no Brief were filed by September 4, 1992.

On September 3, 1992, the Debtor's first pleadings since May 1, 1992, appeared: motions seeking to extend its times for (1) answering the Motion pending completion of discovery; and (2) completing of discovery for sixty (60) days. We note that, per our Order of May 1, 1992, discovery should have already been completed as of September 1, 1992. Hearings on these motions, vigorously opposed by the Bank, were scheduled on September 9, 1992.

After a colloquy with interested counsel on September 9, 1992, at which the

Debtor confirmed its waiver of a jury trial, we entered an Order of September 10, 1992, which provided, *inter alia*, as follows: (1) The non-jury trial of this proceeding was continued to November 30, 1992; (2) All discovery was to be completed by November 1, 1992; (3) Nevertheless, since the Motion was largely in the nature of a demurrer, the Debtor was to file its Answer and Brief in response to it on or before September 18, 1992; and (4) The parties were granted permission to address the issue of whether this proceeding were non-core in submissions to be made on or before September 18, 1992, but, in the absence of any submissions, the court would assume that the proceeding was core pursuant to 28 U.S.C. § 157(b)(2)(C). No submissions challenging the categorization of this proceeding as core were filed. We therefore conclude that it is core and we can proceed to determine it. *See* 28 U.S.C. § 157(b)(1).

The Debtor filed an Answer, Brief, and other materials opposing the Motion. No request to amend the original Complaint filed in the CCP was tendered, although the Debtor suggested that it might do so at the September 9, 1992, conference. At that conference the Debtor also suggested that it might invoke Federal Rule of Civil Procedure ("F.R.Civ.P.") 56(f), applicable to this proceeding through F.R.B.P. 7056, in making its response. The Debtor has, however, not expressly invoked F.R.Civ.P. 56(f), although its Answer does suggest, at several points, that further discovery should precede resolution of several issues allegedly pertinent to the Motion. In a display of excessive vigor, the Bank submitted a Reply Memorandum in support of its Motion on September 24, 1992. *But see In re Jungkurth*, 74 B.R. 323, 325–26 (Bankr. E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.*, 87 B.R. 333 (E.D.Pa.1988) (submission of unsolicited "reply briefs" is strongly disfavored).

## C. DISCUSSION

### 1. THE ALLEGATIONS OF THE COMPLAINT.

■ The Bank is correct that the Motion is, in substance, a demurrer to the Debtor's Complaint. The Complaint is therefore the focal point of the Motion. Thus, we will proceed to quote most of the Complaint as the factual backdrop to the respective opposing parties' legal arguments:

6. On January 12, 1987, Cara and the Bank signed a loan agreement, ...

7. The agreement provided for a $300,000 line of credit and a $250,000 term loan, both secured in part by Cara's accounts receivable.

8. Additionally, the Bank took a security interest in Cara's other intangible assets, including its major Bank accounts, which were required to be maintained at the Bank.

9. Cara's right to draw against the line of credit is limited to an amount equal to 80 percent of its eligible accounts receivable (those less than 90 days old).

10. The agreement further requires Cara to submit to the Bank, periodically, a detailed list of its accounts receivable.

11. A.J. Wood Corporation (Wood) was a customer of Cara's; Cara often performed services as Wood's subcontractor.

12. Wood and Cara were accustomed to doing business at an approximate level of $10,000 per month.

13. Wood's terms with Cara were net on presentation, plus 1.5% per month on any balance unpaid over 30 days.

14. Wood was also a customer of the Bank; on information and belief, Wood frequently owed the Bank amounts in excess of $500,000.

15. Prior to April of 1988, officials at the Bank became concerned that Wood might be unable to meet its obligations to the Bank.

16. On information and belief, the Bank, prior to April of 1988, declared Wood in default of its obligations to the Bank.

17. Prior to April of 1988, the Bank knew that Wood was in serious financial trouble, or actually insolvent.

18. On information and belief, the Bank, prior to April of 1988, became active in the management and operation of Wood.

19. On information and belief, the Bank, prior to April of 1988, assumed an equity position with respect to Wood by converting or acquiring the right to convert all or part of its outstanding and questionable loans into a partial ownership of Wood.

20. On information and belief, the Bank, prior to April of 1988, decided to liquidate all or part of Wood's assets in order to reduce Wood's debt to the Bank.

21. On information and belief, the Bank, prior to April of 1988, either on its own or by directing the activities of Wood, began to liquidate all or part of Wood's assets in order to reduce Wood's debt to the Bank.

22. The Bank knew that Cara was an unsecured trade creditor of Wood.

23. The Bank's line of credit to Cara was, in part, secured by Wood's trade debt to Cara.

24. During 1988, despite its knowledge of Wood's problems, and despite its knowledge that the value of part of its collateral (Cara's account receivable from Wood) was questionable, the Bank continued to advance money to Cara under the agreement.

25. During the spring of 1988, Wood entered into new or expanded service contracts with the Lord & Taylor department store, among others (the new contracts).

26. During April of 1988, Wood requested that Cara perform data entry services related to the new contracts.

27. Cara agreed to perform the services; the contemplated volume was approximately $65,000 over a three-month period, representing a doubling in Wood's business with Cara.

28. Cara and Wood agreed to their usual payment terms for this work (see paragraph 13).

29. Because of its relationship with or equity position in Wood, and because of its relationship with Cara, the Bank was aware of the arrangements between Cara and Wood.

30. Cara performed the services under the contract during the spring and summer of 1988.

31. As the work progressed, the Bank disbursed sums to Cara under the agreement, secured in part by the suddenly increased debt from Wood to Cara.

32. When these disbursements were made, the Bank had in its possession Cara's accounts receivable schedule showing the amounts due to Cara from Wood.

33. When these disbursements were made, the Bank was working with Wood to arrange a solution to Wood's serious financial problems which would minimize the Bank's exposure if Wood failed.

34. During the summer of 1988, the Bank recruited the Nice Corporation (Nice), of Salt Lake City, Utah, to purchase virtually all of Wood's assets.

35. Nice, Wood, and the Bank signed the necessary sales documents on September 1, 1988. . . .

36. Those agreements required Nice to collect Wood's receivables and deliver the proceeds to the Bank in partial satisfaction of Wood's debt to the Bank.

37. Wood's receivables then included amounts owed by Lord & Taylor and others, directly attributable to the work which Cara had done for Wood relative to the new contracts.

38. Wood never paid Cara for that work.

39. On information and belief, Nice collected and paid to the Bank the receivables directly attributable to Cara's work relative to the new contracts.

40. On September 1, 1988, Wood owed Cara $74,777.41, plus accumulated interest.

41. As a result of the agreement between Wood, Nice, and the Bank, Cara eventually received less than or 7% of the amount Wood owed it.

42. Cara remains indebted to the Bank for the disbursements made by the Bank to fund its work for Wood, secured by the debt owed by Wood to Cara.

43. During August and September of 1988, the Bank began to exert pressure on Cara to repay immediately all or part of its debt to the Bank.

44. The conduct of the Bank set forth in the previous allegation was a result of its knowledge that the trade debt from Wood to Cara would never be fully repaid.

45. The Bank, in exerting pressure on Cara to make immediate repayments, was attempting to protect itself in the event that Wood's business failure resulted in Cara's later being unable to pay its debt to the Bank.

46. On information and belief, the Bank was willing to advance money to Cara secured by the Wood account, even though it knew that account to be virtually worthless, because it stood to more than double its money: it would be repaid by Cara and by Lord & Taylor (and other Wood customers) via Nice.

47. When it made the advances to Cara, the Bank knew that Cara would not be paid by Wood, and that Wood's assets were insufficient to pay even its secured creditors (mainly the Bank) in full.

48. An effect of the transactions was to reduce the Bank's exposure to its insolvent customer, Wood, at the direct expense of another customer, Cara.

49. An effect of the transactions was that Cara created valuable accounts receivable for the Bank's benefit, while obtaining a worthless debt in return; i.e. Cara worked for the Bank for free.

50. The Bank intended the results set forth in paragraphs 48 and 49 when it engaged in its course of dealings with Wood and Cara during and after April of 1988.

51. The conduct of the Bank as set forth in the previous allegations damaged Cara in that Cara extended credit to Wood in reliance thereon, which debts remain largely unpaid.

52. The conduct of the Bank as set forth in the previous allegations damaged Cara by causing Cara's cash flow to deteriorate.

53. The conduct of the Bank as set forth in previous allegations damaged Cara by interfering with Cara's ability to obtain credit from other sources.

54. The conduct of the Bank as set forth in the previous allegations damaged Cara by preventing it from taking advantage of other corporate opportunities available to it.

CAUSES OF ACTION—FRAUDULENT MISREPRESENTATION

. . . . .

56. The Bank's conduct in advancing funds to Cara secured by the Wood account was a representation that the account was of sufficient value to be acceptable as collateral to a reasonable commercial lender.

57. The Bank's conduct in advancing funds to Cara secured by the Wood account was a representation that the Bank had made a commercially reasonable investigation of Wood's ability to repay its debts.

58. The Bank's conduct in advancing funds to Cara secured by the Wood account was a representation that the Bank was of the opinion that the account was of sufficient value to be acceptable as collateral to a reasonable commercial lender.

59. The Bank's expression of opinion as set forth in paragraph 58 was a representation that the Bank had no information which would cause a reasonable commercial lender to reject the Wood account as collateral.

60. The Bank's conduct in advancing funds to Cara secured by the Wood account was a representation that Wood was not in default under its obligations to the Bank.

61. Each of the representations set forth in paragraphs 56 through 60 was false when made.

62. The Bank knew of the falsity of each of the representations set forth in paragraphs 56 through 60 at the time it made them.

63. Each of the representations set forth in paragraphs 56 through 60 was material to Cara's decision to extend ad-

ditional credit to Wood as set forth in paragraph 27.

64. Cara's decision to extend additional credit to Wood was made in justifiable reliance on the representations set forth in paragraphs 56 through 60.

65. Cara suffered injury due to its justifiable reliance on the Bank's material misrepresentations.

. . . . .

### FRAUDULENT CONCEALMENT

. . . . .

67. At a time prior to April, 1988, the Bank acquired information that led it to believe that Wood was unlikely to be able to pay its debts.

68. The Bank intentionally failed to disclose that information to Cara.

69. Cara continued to rely on the past representations of the Bank as set forth in paragraphs 56 through 60.

70. Cara was injured as set forth in paragraphs 51 through 54 by its continued justifiable reliance on the past representations of the Bank.

71. Had the Bank disclosed the information referred to in paragraph 67 to Cara, Cara would have immediately put Wood on a cash basis, or would have refused the work under the new contracts.

72. Because of the relationship between Wood and the Bank, Cara reasonably expected the Bank to disclose to Cara all facts basic to the transactions between Wood, Cara, and the Bank.

73. Cara was injured as set forth in paragraphs 51 through 54 by its continued justifiable reliance on the Bank's duty of disclosure.

. . . . .

### NEGLIGENT MISREPRESENTATION

. . . . .

75. The Bank, at all times material hereto, was acting in the ordinary course of its business.

76. The loan of money from the Bank to Cara secured by the Wood receivable was done by the Bank for the mutual benefit of Cara and the Bank.

77. The Bank intended Cara to rely on its opinion as to Wood's creditworthiness in continuing to borrow money from the Bank.

78. The Bank did not exercise reasonable care or competence in that it failed to disclose information in its possession which contradicted its previous representations as to Wood's creditworthiness.

79. Cara was injured as set forth in paragraphs 51 through 54 by its continued justifiable reliance on the Bank's previous representations as to Wood's creditworthiness.

. . . . .

### UNJUST ENRICHMENT

. . . . .

81. Cara's work for Wood relative to the new contacts created a benefit to the Bank, i.e., the Lord & Taylor and other related receivables.

82. Cara was not paid for the work it did relative to the new contracts.

83. The benefit referred to in the preceding paragraph was created by Cara's expenditure of loan proceeds from the Bank secured by the Wood account receivable.

84. Under the circumstances set forth in the preceding paragraphs, it is unjust to permit the Bank to retain both the money collected from Wood's billings under the new contracts and the debt from Cara which funded the creation of those billings.

. . . . .

### INTENTIONAL INFLICTION OF HARM

. . . . .

86. The Bank intended the consequences of its actions during its course of dealings with Cara, Wood, and Nice.

87. The consequences of the Bank's actions during its course of dealings with Cara, Wood and Nice included serious economic harm to Cara and an unearned windfall to the Bank.

88. The Bank's actions during its course of dealings with Cara, Wood and Nice had no legitimate economic justification.

89. The Bank's actions during its course of dealings with Cara, Wood and Nice were taken in utter disregard of the economic consequences to Cara.

. . . . .

2. THE DEBTOR IS APPARENTLY PRESSING ONLY THE INTERRELATED FRAUDULENT MISREPRESENTATIONS, FRAUDULENT CONCEALMENT, AND NEGLIGENT MISREPRESENTATION COUNTS OF ITS COMPLAINT.

■ The Debtor's reply to the Motion makes no reference to its claims of "unjust enrichment" or "intentional infliction of harm," which are recited in Counts IV and V of its Complaint, respectively. Therefore, we believe that we can dispose of these claims on the ground that, since they were not argued, they are waived. *See Universe Tankships, Inc. v. United States,* 528 F.2d 73, 74–76, 77 (3rd Cir.1975); *In re Henderson,* 134 B.R. 147, 155 (Bankr. E.D.Pa.1991); and *In re Slawek, Slawek v. Turmel,* 1990 WL 41877, slip op. at 7 (Bankr.E.D.Pa. April 6, 1990), *recommendation adopted,* 1990 WL 99276 (E.D.Pa. July 12, 1990).

■ However, we further note that [t]he elements needed to fulfill the doctrine of unjust enrichment are

"benefits conferred on ... [the recipient of services] by ... [the party performing the services], appreciation of such benefits by ... [the recipient], and acceptance and retention of such benefits under such circumstances that it would be inequitable for ... [the recipient of services] to retain the benefit without payment of value."

*Burgettstown–Smith v. Langeloth,* 403 Pa.Super. 84, 588 A.2d 43, 45 (1991) (quoting *Wolf v. Wolf,* 356 Pa.Super. 365, 514 A.2d 901, 905–06 (1986)). In addition, the recipient of a benefit must be placed upon notice that the party performing the services expected to be paid. *Fontaine v. Home Box Office, Inc.,* 654 F.Supp. 298, 303 (C.D.Cal.1986); *Sachs v. Continental Oil Co.,* 454 F.Supp. 614, 619–20 (E.D.Pa.1978) (citations omitted).

*In re Stendardo,* 139 B.R. 128, 132 (E.D.Pa.1992). Clearly, there is no evidence that the Debtor expected to be paid by the Bank for continuing to do business with Wood. It is also not at all clear that the Debtor's continuing to do business with Wood could be classified as a "service" to Wood, let alone a "service" to the Bank. Therefore, the facts do not appear to fit the mold of a cause of action for "unjust enrichment." Clearly, a party does not become liable to another simply because that party benefitted as a result of actions of the other.

We are unaware of any tort designated as "intentional infliction of harm." To the extent that the Debtor is claiming a cause of action simply because intentional wrongdoings of the Bank harmed it, it would appear that these claims are subsumed into the Debtor's more recognizable lender-liability causes of action, *i.e.,* negligent or fraudulent misrepresentation to the Debtor of Wood's financial status and fraudulent concealment from the Debtor of Wood's precarious financial status.

3. THE FACTS ALLEGED BY THE DEBTOR DO NOT SUPPORT THE CLAIMS OF NEGLIGENT MISREPRESENTATION, FRAUDULENT MISREPRESENTATION, AND FRAUDULENT CONCEALMENT CLAIMS.

*a. The Elements of the Pertinent Torts.*

The remaining three claims of the Debtor, *i.e.,* the Counts alleging the Bank's negligent and fraudulent misrepresentation to the Debtor of Wood's financial status and concealment of that status from the Debtor by the Bank, are argued together in the Debtor's submissions in response to the Motion. Specifically, what is raised by the Debtor in its Memorandum of Law in opposition to the Motion are (1) an argument that the Bank's alleged duty to disclose Wood's status to the Debtor arose from the parties' purported fiduciary relationship and the Bank's communication which allegedly disclosed relevant information in part; (2) several cases which are referenced for the proposition that the Bank's profit at the expense of the Debtor created a duty of

disclosure where one might not otherwise exist; and (3) a contention that the presence of "special circumstances" justifies a distinction from the results of some of the authorities against the Debtor's position cited by the Bank in its submissions. The Debtor's discussions of these issues suggest a recognition by the Debtor that it has a difficult burden of establishing, with respect to all of its remaining claims, that the allegations of the Complaint support the conclusion that the Bank breached a duty to it. The Debtor appears to concede that, if it fails to establish that the Bank had a cognizable legal duty to inform it of Wood's financial status, it would have no claim under any of its legal theories. Thus, the Debtor never gets into a discussion of the elements of any of the specific torts invoked in the Complaint. We agree that the elements of these torts are similar and hence we can discuss them all together.

■ Under Pennsylvania law, which the parties appear to agree controls this dispute, a fraudulent misrepresentation is established by presenting clear and convincing evidence of (1) a misrepresentation of a material fact; (2) a fraudulent utterance thereof by the defendant; (3) an intention that the other person would thereby be induced to act, or to refrain from acting; (4) justifiable reliance by the recipient; and (5) damage to the recipient caused by this reliance. *See Temp–Way Corp. v. Continental Bank*, 139 B.R. 299, 322 (E.D.Pa. 1992); *Mursau Corp. v. Florida Penn Oil & Gas, Inc.*, 638 F.Supp. 259, 261 (W.D.Pa. 1986); *Marian Bank v. International Harvester Credit Corp.*, 550 F.Supp. 456, 461 (E.D.Pa.1982); and *Smith v. Renaut*, 387 Pa.Super. 299, 306, 564 A.2d 188, 191–92 (1989).

■ The only "distinguishing factors" between fraudulent misrepresentation and negligent misrepresentation is that, as to negligent misrepresentation, the state of mind of the actor to intentionally harm the plaintiff need not be proven and the plaintiff must arguably meet a lesser standard of proof. *See Temp–Way, supra*, 139 B.R. at 325. "Fraudulent concealment" is sim-

ply a species of fraudulent misrepresentation. All of the elements of a fraudulent misrepresentation must be proven to support such a claim, plus the plaintiff must establish the materiality of the factual matter which was allegedly wrongfully not disclosed to the plaintiff. *See Neuman v. Corn Exchange Nat'l Bank & Trust Co.*, 356 Pa. 442, 451, 450, 51 A.2d 759, 765, 764 (1947); and *Mancini v. Morrow*, 312 Pa.Super. 192, 202, 458 A.2d 580, 584–85 (1983). Hence, all of the torts alleged and argued by the Debtor as supporting its claims may be considered together. We will consider each of the five elements of fraudulent misrepresentations in turn.

*b. The General Positions of the Parties.*

The Debtor alleges that the Bank's advance of funds to it secured by the Wood account was a misrepresentation, as it falsely represented that the Wood account was of sufficient value that the Bank, as a reasonable commercial lender, was of the opinion that it would constitute acceptable collateral, and that the Bank had no information which would cause it to reject the account as suitable. This advance of funds also falsely represented, according to the Debtor, that Wood was not in default under its obligations to the Bank.

Secondly, the Complaint alleged that the Bank knew that all of these representations were false. Thirdly, the Complaint stated that each of these misrepresentations were material to the Debtor's decision to extend additional credit to Wood. Fourthly, the Debtor claimed that its decision to extend credit to Wood was made in justifiable reliance on these same misrepresentations. Lastly, the Debtor alleged an injury suffered due to this justifiable reliance.

Noticeably absent from the allegations set forth in connection with Count I are any allegations that the Bank *intentionally* acted to induce the Debtor to extend credit to Wood. However, in the allegations regarding Fraudulent Concealment in Count III, the elements of which, as we have noted, are almost identical to the elements necessary to be proven in connection

with the misrepresentation claims, the Complaint does allege that the Bank acquired information about Wood and intentionally failed to disclose such information to the Debtor.

In support of the Motion before us, the Bank argued that, as a matter of law, neither misrepresentation nor reliance was ever established by the Debtor. Regarding misrepresentation, the Bank presented deposition testimony in which Irving R. Safra ("Safra"), the Debtor's President, admitted that he was never told, and never relied upon, any specific statements regarding Wood's financial status made by the Bank. Rather, this deposition testimony sets forth that Safra believed only that material information was omitted or concealed. The Bank responded that it had no duty to disclose information regarding Wood, that any omissions were thus non-actionable, and that, therefore, as a matter of law, it was entitled to summary judgment. Similarly, the Bank argued that the Debtor failed to establish justifiable reliance on its part.

c. *The Debtor has not Alleged Facts Which Could Support our Finding a Duty of the Bank to Disclose Wood's Financial Condition to the Debtor.*

Both parties agree that, under Pennsylvania law, a lender's failure to disclose information about one of its customers is generally actionable only when there is an independent duty on the lender to in fact disclose same. *See, e.g., Chrysler Credit Corp. v. First Nat'l Bank & Trust Co.,* 746 F.2d 200, 207 (3rd Cir.1984); and *City of Harrisburg v. Bradford Trust Co.,* 621 F.Supp. 463, 473 (M.D.Pa.1985). *Cf. Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3rd Cir.1988) (applying law of Virgin Islands). The Debtor accepts, as an accurate statement of applicable Pennsylvania law, the statement, in *Bradford Trust,* that a duty to disclose information may arise in only three instances: in a fiduciary relationship, in a non-fiduciary relationship, and in a non-fiduciary relationship where there is a non-independent duty to speak. *Bradford Trust, supra* at 473–74. The last instance refers to a situation

where the defendant has revealed some information which would qualify as only a misleading half-truth if not expanded by more complete disclosure. *Id.* at 474.

The Debtor argues that the Bank had a duty to disclose information regarding Wood because the relationship between the Debtor and the Bank was a fiduciary one and because the Bank created a non-independent duty to speak when one of its officers warned the Debtor to "watch your receivables." However, we find the Debtor is not able to substantiate that either one of these circumstances as actionable.

■ As the Debtor aptly pointed out in its Answer to the Motion, it was obliged to show the existence of a fiduciary relationship by establishing that there was a relationship involving "trust and confidence" between it and the Bank. Further, there must be a confidence on the part of one party and a domination and influence on the part of the other, and both parties must have acknowledged such a fiduciary relationship. *Bradford Trust, supra,* 621 F.Supp. at 473. However, based on the Debtor's proffered case law, the Debtor cannot meet its own referenced criteria.

■ The Debtor claims that the relationship of trust and confidence was developed between the two parties and is evidenced by the longstanding duration of their relationship; the Bank's willingness to renew and increase the Debtor's line of credit over the years; the Bank's willingness to extend credit above the Debtor's borrowing limits when the need arose; and Safra's monthly meetings with the Bank's officials to review the Debtor's business developments and financial status, including identifying to the Bank with whom it was doing business. However, *Bradford Trust* expressly provides that the length of a "trust or confidence" relationship is of no consequence. 621 F.Supp. at 473. Thus, the "long standing duration" of the Debtor's relationship with the Bank is of virtually no relevance in establishing a fiduciary relationship. Further, even if the Bank's above-stated actions could be characterized as "domination or influence" over the Debt-

or (which does not seem likely), and even if the Debtor believed that it was operating under a fiduciary relationship, *Bradford Trust* states that "it is not enough to show that the plaintiff reposed its trust in the defendant; *the latter must also have accepted the fiduciary relationship."* *Id.* (emphasis added). The Debtor presents no evidence of a mutual understanding by both parties that their relationship was a fiduciary one.

In addition, relevant case law specifically states that lender-borrower relationships do not ordinarily create fiduciary duties. *See Paradise Hotel, supra,* 842 F.2d at 53; *Chrysler Credit, supra,* 746 F.2d at 207; *Temp–Way, supra,* 139 B.R. at 318; *Blue Line Coal Co. v. Equibank,* 683 F.Supp. 493, 496 (E.D.Pa.1988); and *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, 461, 410 A.2d 344, 348 (1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). This principle arises from the presumption that "the relationship between lenders and borrowers is conducted at arms length and the parties are each acting in their own interest." *Temp–Way, supra,* 139 B.R. at 318. *See also Paradise Hotel, supra,* 842 F.2d at 53, citing *Weinberger v. Kendrick,* 698 F.2d 61, 79 (2nd Cir.1982); and D. Berger & J. Hirsch, *Pennsylvania Tort Liability for Concealment and Nondisclosure in Business Transactions,* 21 TEMPLE L.Q. 368, 372 (1948) ("There is no duty to disclose material information as between debtor and creditor.").

A fiduciary relationship may arise between a lender and a borrower where the lender gains substantial control over the borrower's business affairs. *See Temp–Way, supra,* 139 B.R. at 318; *Blue Line Coal, supra,* 683 F.Supp. at 496; and *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986). However, *Temp–Way, supra,* 139 B.R. at 318, holds that "control" entails

> evidence that the lender was involved in the actual day-to-day management and operations of the borrower or that the lender had the ability to compel the borrower to engage in unusual transactions.

*Blue Line Coal Co., Inc. v. Equibank,* 683 F.Supp. at 496 (citing *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986)). The mere monitoring of the borrower's operations and the proffering of management advice by lenders, without more, does not constitute control. *In re W.T. Grant Co.,* 699 F.2d [599] at 610–11 [ (2d Cir.1983) ]; *Krivo Indus. Supply Co. v. Nat'l Distillers & Chemical Corp.,* 483 F.2d 1098, 1105 (5th Cir.1973). Moreover, action taken by the creditor to minimized risk does not constitute total and absolute control. *James E. McFadden, Inc. v. Baltimore Contractors, Inc.,* 609 F.Supp. 1102, 1105 (E.D.Pa.1985).

The Debtor has presented no evidence that the Bank was involved in the day-to-day operations of the Debtor's business, or that the Bank had the ability to compel the Debtor to make any "unusual" business decisions. In fact, sections of Safra's deposition testimony suggest that the Debtor took pride in the fact that it made its own business decisions. *See* Deposition Transcript at 111 ("I don't call the bank when someone calls me for business."); and *id.* at 263 (regarding whether Continental Bank ever advised Cara to do business with Wood: "I don't think they advised me."). Safra also stated that there was never any suggestion made by the Bank that the Debtor and Wood do business together, and he admitted that the Bank had nothing to do with the formation of their business relationship. Thus, from the evidence that has been presented, the Debtor has not rebutted the presumption that the lender-borrower relationship in issue was not a fiduciary relationship.

The Debtor also argues that, even if there were no fiduciary relationship between it and the Bank, the warning to the Debtor by a Bank officer to "watch your receivables" effectively created a non-independent obligation on the part of the Bank to fully inform the Debtor of Wood's financial status. The Debtor thus alleged that a bank officer's words stating "I tried to warn you about Wood but I couldn't say anything, because I had to be very cryptic"

and "watch your receivables" were partial disclosures creating a duty on the part of the Bank to inform the Debtor completely about Wood's financial condition. Assuming the veracity of these statements, the Bank responded by arguing that these statements were simply "wise advice" instead of half-truths. We agree that these statements were at worst generalized comments which represented nothing which was misleading about Wood's financial condition. These statements did not contain the sort of false reassurances and innuendos which could be deemed half-truths sufficient to give rise to a duty of the Bank to further disclose all of the facts known to the Bank about Wood, as is required to create a non-independent obligation to speak to them. Rather, they were warnings which should have put the Debtor on its guard rather than lulling it into a sense of false security.

Given these serious weaknesses in both of the Debtor's arguments, we conclude that the Debtor cannot establish any duty of the Bank to disclose information on Wood's financial status to the Debtor. In the absence of establishing such a duty, the parties (and this court) agree that any omission of advice concerning the Debtor's financial status by the Bank is not actionable.

*d. The Debtor has not Alleged Facts Which Could Support a Finding That the Debtor Justifiably Relied Upon the Bank's Nondisclosure of Information as Establishing Wood's Financial Strength.*

Furthermore, even if the Debtor could have proven a relationship existed between it and the Bank that was sufficient to make any omission on the Bank's part actionable, the Debtor could not possibly substantiate a cause of action for fraudulent or negligent misrepresentations or concealment against the Bank because it has not produced any factual allegations sufficient to support its requisite justifiable reliance on the omitted information.

In this regard, it is apparent that the Debtor had the ability and the right to investigate Wood's credit status itself. In the business world, a company must usually make its own investigations and decisions about the customers with which it chooses to do business. The company cannot rely on its lending institution to do so.

As is noted at page 773 *supra*, the Debtor's emphasis on the Bank's warning that it should "watch its receivables" should have heightened the Debtor's vigilance in checking on the financial status of all of its customers, including Wood. There is no indication that the Debtor responded to the Bank's warning in any way as to any of its customers, even to the extent of questioning the Bank in order to obtain a further explanation of its "cryptic" warnings. Clearly, there is no indication that the Debtor turned its attention in any way to the subset of its customers to which it logically should have turned, considering that the source of this information was the Bank, *i.e.*, its customers who were also customers of the Bank, such as Wood.

The evidence clearly establishes that the Debtor did not inquire of the Bank as to the particular financial status of Wood. Had it done so, and been given false or misleading information, a different case would have been presented. Likewise, a different case would have been presented had the Bank brought Wood to the Debtor as a customer or had the Bank in any way affirmatively misrepresented Wood's financial situation to the Debtor.

With all of the possible scenarios in which reliance might have been established absent, the facts of the instant case begin to sound, in relevant particulars, very much like those of *Peoples Bank of Virgin Islands v. Figueroa*, 559 F.2d 914 (3rd Cir. 1977). In that case, two endorsers or cosigners of a loan to a bank were exonerated from liability by the trial court because it found that the bank failed to inform the endorsers of the principal obligor's poor financial condition and because a bank employee who was the principal obligor's partner violated applicable local loan practices in making the loan. *Id.* at 916.

Beginning from the premise that the bank had no duty to disclose information

concerning its customer, the obligor, to anyone, *id.* at 916–17, the Court of Appeals observed that the endorsers made no attempt to discern the obligor's financial status before signing for his loan. *Id.* at 917–18. The court therefore reversed the decision of the trial court, holding, *id.* at 918–19, that

> [i]n view of the endorsers' total lack of knowledge of, and reliance upon, even the information which appeared on Figueroa's loan application, it is not possible to give credit to any claim that the Bank misrepresented to them either the fact or the amount of Figueroa's liabilities at the time of endorsement.

. . . . .

It is enough for us to recognize that here the Bank neither procured the endorsers nor induced them to endorse, nor was the Bank asked for any financial details pertaining to Figueroa's account. Had any of those circumstances obtained here, we would be presented with a different case. Absent such circumstances, endorsers who make no inquiries of the maker's bank and who are procured solely by the maker of the note cannot expect the bank which holds the note to protect their interests. *E.g., Cunningham v. Merchants' National Bank,* 4 F.2d 25, 30 (1st Cir.), *cert. denied,* 268 U.S. 691, 45 S.Ct. 511, 69 L.Ed. 1160 (1925).

The Debtor did not rely upon knowledge of Wood's current financial status in doing business with it. The Bank gave the Debtor no information about Wood, nor was it asked to provide same. Rather, like the endorsers in *Figueroa,* the Debtor is unable to satisfy the requirement of justifiable reliance on the Bank's action, as is necessary to support a claim of negligence representation, fraudulent representation, or fraudulent concealment. As to fraudulent concealment, we note that the materiality of the non-disclosure of Wood's financial status pales in light of the absence of proof of the elements of justifiable reliance.

Also absent from the record is any suggestion that the Bank intended the Debtor to act on the basis of its lack of a warning about Wood's financial condition. The Bank is not alleged to have taken any act to hamper the Debtor's investigation of Wood. It is difficult to believe that the Bank could have predicted that the Debtor would not check upon Wood's financial status on its own. The Bank even tried to warn the Debtor about Wood's situation, though in a "cryptic" manner. These facts make it difficult to believe that the Bank intended to induce the Debtor to extend further credit to Wood.

We therefore conclude that controlling Pennsylvania law does not support any of the Debtor's causes of action.

*e. None of the Decisions from Other Jurisdictions Cited by the Debtor Support a Claim on the Basis of the Factual Allegations Made Here.*

 Failing to locate law which supports its claims under Pennsylvania law, the Debtor cites five cases from other jurisdictions which it contends support the principle that, while courts have traditionally viewed the relationship between lender and borrower as an arms-length relationship which creates no special obligations to the borrower, nevertheless a lender owes a fiduciary duty of disclosure where, as allegedly is the case here, a lender profits at a borrower's expense by withholding material information, *e.g., Nie v. Galena State Bank & Trust Co.,* 387 N.W.2d 373 (Iowa App.1986); *Barnett Bank of W. Florida v. Hooper,* 498 So.2d 923 (Fla.1986); *Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648 (1976); *First National Bank in Lenox v. Brown,* 181 N.W.2d 178 (Iowa 1970); and *Earl Park State Bank v. Lowmon,* 92 Ind.App. 25, 161 N.E. 675 (1928).

We find each of these cases to include facts which quite readily set them apart from the facts alleged in the instant Complaint or established by discovery which has taken place or is likely to take place in connection with the instant case.

Most notably, in every one of these cases except *Sjogren,* the lender found liable played an active and crucial role in causing

its borrower claiming such liability to make a loan to another of the lender's customers. Thus, in *Nie*, the plaintiff was found to be "a hesitant investor" who "relied heavily" upon advice from his bank lender that the parties to whom he made certain loans were in a good business and had produced accurate financial records. 387 N.W.2d at 377, 374. Also, the bank officer who gave this advice and handled the loan failed to disclose that he was half-owner of the other customer. *Id.* at 374.

In *Hooper*, the court had before it a motion for a directed verdict in favor of a lender against which liability was claimed. An officer of the lender bank informed the plaintiff that the subject of his investment was sound. 498 So.2d at 924. However, the bank thereafter discovered that its customer who sought to borrow from the plaintiff was engaged in a fraudulent check-kiting scheme. *Id.* Nevertheless, the bank failed to inform the plaintiff of this discovery concerning the other customer's gross frauds in the course of a three-way conversation with the plaintiff and the other customer in which the plaintiff agreed to make a very substantial additional loan to the other customer. *Id.* Ten days after this second loan, the bank closed out the other customer's account, but not before it recouped almost all of its losses from the funds loaned to the customer by the plaintiff.

In *Brown*, the lender-bank suggested to one of its customers that he sell his businesses against which the bank had liens, due to the poor financial condition of the businesses. 181 N.W.2d at 180. However, when contacted by the lender-liability claimant, a prospective purchaser of the businesses, whom he knew trusted him "implicitly," *id.* at 182, a bank officer stated that the subjects of the sale were "going businesses" and that the claimant "should be able to do all right in them." *Id.* at 180. The bank officer also failed to disclose the presence of the bank's liens. *Id.* The claimant, who financed his purchase of the business with a bank loan, was, only under those circumstances, permitted to raise fraudulent misrepresentation as a defense to the bank's claim on its loan. *Id.* at 181–83.

*Lowmon* also involved a loan to a lender-liability claimant who had "great confidence" in the judgment of a bank officer. 161.N.E. at 677. The bank officer, in making a loan to the claimant, falsely represented that a company in which the claimant intended to invest the loan proceeds was solvent and that the bank stood behind the loan under a guarantee which it in fact had never executed. *Id.* Under these facts, a jury verdict in favor of the claimant was sustained.

In *Sjogren*, unlike the prior cases, the lending bank did not make any affirmative misrepresentation of the financial condition of the borrower from the party asserting a lender liability claim. However, the bank officer who made the *Sjogren* loan was, unknown to the claimant, "calling all the shots" for the borrower corporation, 244 N.W.2d at 650, similar to the situation in *Nie, supra*. Also, the borrower was, similar to the facts in *Hooper*, engaged in grossly fraudulent activity which was known to the bank prior to its making the loan in question. *Id.* at 651. And, as in *Lowmon*, a jury verdict had already been entered in favor of the plaintiff, and the issue before the court on appeal was whether a judgment should be entered for the bank notwithstanding the verdict. *Id.* at 649.

The *Sjogren* court was very careful to reiterate the significance of the presence of the aforesaid "special circumstances" which led to its decision upholding the verdict in favor of the claimant. The court states that

> the determinative question is whether Richfield Bank, through its loan officer, Michael Thompson, actually knew that National Pollution was so irretrievably insolvent that it had no reasonable expectation of fulfilling its obligations under the contract with respondents. If Richfield Bank knew only that National Pollution was insolvent, as opposed to irretrievably insolvent, it would not have actual knowledge of fraud and thus would not be under a duty to disclose the financial condition of its depositor to respondents.

Therefore, we hold that under the unique and narrow "special circumstances" of this case, in which the bank had *actual knowledge* of the fraudulent activities of one of its depositors, it had an affirmative duty to disclosure [sic] those facts to the respondents before it engaged in making the loan to respondents which furthered the fraud.

*Id.* at 651, 652.

The facts of the instant case are readily distinguishable from those in *Sjogren,* on the very points which that court deems decisive. There is no allegation here that Wood was engaged in any sort of fraudulent activity which would cause it to be classified as "irretrievably insolvent," as opposed to merely insolvent, under the definition of that term in *Sjogren.* The very significant involvement and participation of the bank officer in the fraudulent schemes also supported the finding, in *Sjogren,* of "unique and narrow 'special circumstances.' " Here, no such "special circumstances" existed. Hence, under the holding of *Sjogren,* the result under the instant facts would be against the Debtor.

None of the foregoing cases were decided by the Pennsylvania Supreme Court, applying Pennsylvania law, whose directives we must follow or predict. Our review of the cases cited by the Debtor from other jurisdictions indicates that no court has ruled in favor of a borrower on the basis of such weak facts as those alleged by the Debtor here. There is no indication that Pennsylvania would be a trail-blazer in the area of lender liability. In any event, the trail which the Debtor asks us to blaze is beyond the fringes of the wilderness of lender liability. We predict that the Pennsylvania Supreme Court, if faced with the instant Motion, would determine that it must be granted and this case dismissed.

*f. The Bank May Have Breached its Duties to Wood if it had Divulged Wood's Financial Status to the Debtor.*

We also find it appropriate to observe that the Bank may have been precluded from divulging Wood's complete financial status to the Debtor because of its obligation to Wood to keep such information private and confidential. As the court states in *Figueroa, supra,* 559 F.2d at 917, in response to similar claims that a bank should have divulged its customer's financial status to its co-borrowers,

the Bank could hardly have volunteered financial information [about the borrower] (or even acceded to an unauthorized request from prospective endorsers to disclose such data) without breaching duties of confidentiality and privacy in its dealings with its customers. *See Peterson v. Idaho First National Bank,* 83 Idaho 578, 367 P.2d 284 (1961); Annot., 92 A.L.R.2d 891 (1963); 10 Am.Jur.2d, *Banks* § 332 (1963); *see also First National Bank v. Brown,* 181 N.W.2d 178, 183 (Iowa 1970) (recognizing the duty of confidentiality but holding for the endorser where the withheld information was of public record) (footnote omitted).

*Accord, Constitutional Defense Fund v. Humphrey,* 1992 WL 164734, slip op. at *5–*6 (E.D.Pa. July 2, 1992); and *Commonwealth v. DeJohn,* 486 Pa. 32, 45–49, 403 A.2d 1283, 1289–91 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980).

Thus, while not precluding our finding a duty of a bank to disclose information to its customers about other customers when asked directly or when the other customers are engaged in a known fraudulent scheme, as in *Sjogren,* we believe that in light of the absence of such facts, the Bank probably had a duty to Wood to not volunteer information regarding its financial status to the Debtor.

*g. Allowing Further Discovery by the Debtor to Avert the Granting of the Motion is not Appropriate at This Late Stage in the Case.*

We note that the Debtor claims that it should be granted a further opportunity to seek discovery of the following prior to our

ruling in this proceeding: (1) the Bank's complete version of the cautionary statements made to Safra by the Bank's officers; (2) whether Wood was "irretrievably insolvent;" (3) whether a "special relationship" existed between the parties; and (4) whether the Bank actually did profit at the Debtor's expense.

Regarding the first area of prospective additional discovery raised by the Debtor, we note that Safra, as a party to any such statements, is himself capable of, and presumably has, a full account of the statements made to him by the Bank's officers. We note that, even per Safra's version of same, there is no evidence of any statements which even approached misleading "half-truths." The Debtor appears to misconstrue the nature and narrowness of this exception to the rule that a fiduciary relationship does not exist between lender and borrower. It is not any statement of a lender to its customer about the financial status of another customer which creates a non-independent duty to speak, but rather only a misleading statement. There is nothing the least bit misleading in the advice of the Bank's officers that the Debtor should "watch its receivables."

Similarly, the Debtor appears to misconstrue the "irretrievably insolvent" exception to the rule that a failure of a lender to disclose a borrower's insolvency is not actionable. This term is applied in *Sjogren* in reference to blatant fraudulent conduct of the borrower in which the lender was an active participant. There is no suggestion that Wood (or the Bank) was guilty of any sort of fraudulent conduct.

The question of whether a "special relationship" existed between the Debtor and the Bank has already been explored at length. *See* pages 772–774 *supra.* The Debtor's reference to a need for discovery of this issue is too generalized to be meaningful. Certainly, nothing is alleged which could significantly alter our previous analysis of this issue.

Regarding the Bank's profit at the expense of the Debtor, we have assumed the accuracy of the allegations of the Com-

plaint in this regard. We simply do not believe that these allegations are sufficient to carry the day for the Debtor.

Hence, we conclude that additional discovery is very unlikely to change the outcome of this decision. The only effect of our rendering this decision at this juncture is to save the Debtor the cost and frustration of trying this proceeding when its cause is doomed to defeat.

Finally, although we note that the Debtor claims that certain discovery should be permitted before judgment is entered against it, it has failed to expressly invoke F.R.Civ.P. 56(f). We also note that Rule 56(f), as well as the Debtor's prospect of amending its Complaint, was expressly raised by the Debtor as measures it might utilize in defending against the Motion at the conference on September 9, 1992. However, no such measures were followed up on by the Debtor.

We note that a failure to file affidavits indicating with precision the need for additional discovery may in itself justify denial of a F.R.Civ.P. 56(f) motion. *See Lunderstadt v. Colafella,* 885 F.2d 66, 70 (3rd Cir.1989). In any event, denial of a Rule 56(f) motion is appropriate if the movant has had an adequate opportunity to obtain discovery or submit opposing affidavits prior to confrontation with a motion for summary judgment. *See* 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.24, at 56–820 (2nd ed. 1991). This proceeding was filed almost two and a half years ago. The original discovery deadline, established on May 1, 1992, expired on September 1, 1992, before an additional period to take discovery was even requested by the Debtor. By this time, the *new* discovery deadline has almost expired, and the Debtor has not favored us with advice of any revelations helpful to its cause in the course of same.

The only inference which we can logically draw from the foregoing is that the Debtor's case cannot be further improved because the facts necessary to support a viable cause of action are not to be found. It is therefore appropriate to grant the Bank's Motion at this juncture.

D. CONCLUSION

The dismissal of the instant proceeding which follows herefrom will undoubtedly impact negatively upon confirmation of the Debtor's Plan. Since this case has been pending for almost two years, we are not inclined to give the Debtor much more time to produce a plan which depends on favorable resolution of any further contingencies. Conversion of the case to Chapter 7 may be in the offing.

We are aware that the Debtor's Objection to the Bank's claim on the ground that its security interest was not perfected remains unresolved. However, we expressed our unchanging skepticism of the merits of the Objection as early in the case as on January 24, 1991.

In order to sort out the future of this case, we will set down a status conference in this case on November 4, 1992, in our accompanying Order.

### ORDER

AND NOW, this 23rd day of October, upon consideration of the Motion of Continental Bank ("the Bank") for Summary Judgment ("the Motion"), the Answer of the Debtor thereto, and the Memoranda of Law of the parties, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED.

2. Judgment is entered in favor of the Defendant, CONTINENTAL BANK, and against the Plaintiff–Debtor, THE CARA CORPORATION.

3. A conference is scheduled to determine the future of this case and the Debtor's further Objection to the Bank's claim, in light of his decision.