NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TODD CHRISTIANSON, individually and as director of GREAT ALASKA LAWN & LANDSCAPING, INC., GREAT ALASKA NURSERY, INC., and GAGE DEVELOPMENT, INC.; TITAN TOPSOIL, INC.; TITAN ENTERPRISES, LLC; CHRISTIANSON FAMILY LIMITED PARTNERSHIP; and GAGE DEVELOPMENT, INC., | ) ) ) ) ) ) ) ) ) ) ) | Supreme Court Nos. S-13985/S-14005<br><br>Superior Court No. 3AN-06-13690 CI<br><br>MEMORANDUM OPINION<br> AND JUDGMENT[*]<br><br>No. 1445 - December 5, 2012 |
| Appellants and Cross-Appellees, | ) ) ) | |
| v. | ) ) | |
| FIRST NATIONAL BANK ALASKA, | ) ) ) | |
| Appellee and Cross-Appellant. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan, Judge.

Appearances: Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellants/Cross-Appellees. Terrance A. Turner and Natalie A. Cale, Turner & Mede, P.C., Anchorage, for Appellee/Cross-Appellant.

---

[*] Entered under Alaska Appellate Rule 214.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

This appeal arises out of a long-standing banking relationship between a small business owner, Todd Christianson, and a loan officer at First National Bank Alaska, William McGrew. McGrew serviced Christianson's loans for over ten years. Over that time, in violation of the bank's policies, McGrew approved over 250 mostly short-term loans and loan extensions and engaged in other unusual business practices. After McGrew's death, First National discovered the questionable loans. Although the bank refused to make Christianson any additional loans, it did approve a final consolidated loan that would meet Christianson's other obligations to the bank.

After these events Christianson was unable to meet his obligations to First National. Christianson and his various corporate entities sued the bank alleging that McGrew had breached a fiduciary duty, breached contracts and the implied covenant of good faith and fair dealing, and violated the Alaska Unfair Trade Practices and Consumer Protection Act. First National counterclaimed for the remaining balance on the consolidated loan. After a ten-day trial, the superior court found against Christianson on all counts. Additionally, the superior court found that Christianson had not suffered any damages in his treatment by McGrew or the bank. The court ruled in favor of the bank on the loan, holding Christianson and all of his companies as well as the Christianson Family Limited Partnership (CFLP) liable for the loan.

Christianson and the related entities appeal. First National cross-appeals, asserting that its various affirmative defenses, which due to the disposition of the case were not ruled upon below, preclude a finding in Christianson's favor.

We review the superior court's factual findings for clear error.[2]  We will reverse only when "left with a definite and firm conviction . . . that a mistake has been made."[3]  "We apply our independent judgment to questions of law" and to the superior court's legal analysis.[4]

This case turns on the superior court's factual findings.  After a review of the record, we conclude that the court's findings are not clearly erroneous, and we affirm them.  And because the superior court's decision was thoughtful and generally thorough, we attach it as an appendix.

The superior court did not directly address one issue:  Christianson's argument that CFLP should not be liable for the outstanding loan amount.  We briefly address that issue now.

The superior court awarded First National the unpaid principal and interest, finding that Christianson "[a]t all relevant times . . . as sole decision maker for plaintiffs, knowingly and willingly intermingled their assets and disregarded their respective limited liability/corporate/limited partnership forms for purposes of their dealings with [First National]."  Christianson argues that the superior court's finding of intermingling could not "reasonably apply to CFLP," that CFLP should not be liable on the consolidated loan because it was not the maker or guarantor of the loan, that CFLP

---

[2]     *Stewart v. Elliot*, 239 P.3d 1236, 1239-40 (Alaska 2010).

[3]     *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008) (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)).

[4]     *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) ("We apply our independent judgment to questions of law, adopting 'the rule of law most persuasive in light of precedent, reason, and policy.' " (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979))); *State v. Jeffery*, 170 P.3d 226, 229 (Alaska 2007); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983); *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 834 (Alaska 1974).

cannot be liable for the debts of the general partner, and that CFLP was intentionally kept separate from Christianson's other entities. Christianson asserts that First National failed to prove that CFLP was liable on this debt.

The superior court's finding that Christianson disregarded the corporate form of all of his various entities, including CFLP, is not clearly erroneous. There is evidence that CFLP was involved in a variety of the subject transactions throughout the relevant time periods, and Christianson controlled CFLP's actions. Additionally, Christianson added CFLP as a plaintiff in this action in his Third Amended Complaint in October 2008. This suggests that Christianson considered CFLP to be an injured party in the action and defeats Christianson's argument that CFLP was separate and was not involved in the transactions underlying this litigation.

For these reasons and those contained in the attached findings of facts and conclusions of law of the superior court, we AFFIRM the superior court's decision. Because we affirm the superior court's decision, we do not reach the cross-appeal.

# APPENDIX

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| TODD CHRISTIANSON, individually and as director of Great Alaska Lawn and Landscaping, Inc., Great Alaska Nursery, Inc., And Gage Development, Inc.: TITAN TOPSOIL, INC.; TITAN ENTERPRISES, LLC.; CHRISTIANSON FAMILY LIMITED PARTNERSHIP, and GAGE DEVELOPMENT, INC. | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| FIRST NATIONAL BANK ALASKA, | ) ) |
| Defendant. | ) ) |

Case No. 3AN-06-13690CI

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[*]

This case came on for a bench trial starting September 8, 2009 and concluding with closing arguments on October 15, 2009. Based on the evidence presented at trial, this court makes the following findings of fact and conclusions of law.

## I. FINDINGS AND FACTS

### A. The Parties

---

[*] These Findings of Fact and Conclusions of Law have been edited to conform to the technical rules of the Alaska Supreme Court.

Plaintiff Todd Christianson is a resident of Anchorage, Alaska. Christianson was born and raised in Anchorage. In 1992, while still in high school, he started a lawn mowing business. Christianson continued the business after high school, while he attended the University of Alaska at Anchorage and later Alaska Pacific University, where he graduated with a Bachelor's Degree.

Over the years his business grew and he expanded into landscaping, nursery, and topsoil work. As his enterprise grew, Christianson formed many separate business entities.

Plaintiff Titan Topsoil, Inc. (TT) is an Alaska corporation with Christianson as a 100% shareholder.

Plaintiff Titan Enterprises, LLC is a limited liability company with Christianson as the company's sole member.

Plaintiff Gage Development, Inc. (GDI) is an Alaska corporation. It was involuntarily dissolved in 2003 but was reinstated in 2009 and is currently a corporation in good standing. Christianson is a 100% shareholder of GDI.

Great Alaska Lawn and Landscaping, Inc. (GALL), was an Alaska corporation that was involuntarily dissolved on November 27, 2002. Christianson was a 100% shareholder and at the time of the company's dissolution he was the sole director.

Great Alaska Nursery, Inc. (GAN) is an Alaska corporation that was involuntarily dissolved on May 5, 2002. Christianson was a 100% shareholder and at the time of dissolution he was the sole director.

Plaintiff Christianson Family Limited Partnership (CFLP) is a limited partnership with Christianson as the general partner. On November 5, 2001, for estate planning purposes, Christianson in his individual capacity assigned to himself as general

partner of CFLP all his property of any kind, tangible and intangible, including his rights as a shareholder of GALL and GAN.

For the purposes of this decision, Christianson and all his business entities will be referred to collectively as plaintiffs. At all relevant times, Christianson, as the sole decision maker for plaintiffs, knowingly and willingly intermingled their assets and disregarded their respective limited liability company/corporate/limited partnership forms for purposes of their dealings with FNBA, William McGrew, and McGrew's other loan customers. Similarly, McGrew treated the plaintiffs as entities belonging to and alter egos of Christianson.

Defendant First National Bank (FNBA), formerly First National Bank of Anchorage, is a commercial banking corporation. Its principal place of business is Anchorage, Alaska.

William "Bill" McGrew was the person Christianson dealt with at FNBA. McGrew died on December 21, 2004.

Prior to his death, McGrew was employed by FNBA as a senior vice president in charge of the banks commercial loan department. McGrew became a loan officer in 1978.

McGrew's lending limit was increased over time, and before his death, his lending limit was $1.5 million per loan.

As a senior official employed by FNBA, McGrew was FNBA's agent. FNBA granted McGrew the actual authority to write loans to plaintiffs.

Christianson used FNBA as his bank in the late 1980s or early 1990s before he switched to Northrim Bank. In late 1994 or early in 1995, Christianson returned his business to FNBA.

When Christianson first started banking with FNBA, he reasonably believed that McGrew had the apparent authority on behalf of the bank to write loans to

plaintiffs and conduct the bank's business, by virtue of McGrew's title and placement in the bank's organization.

On January 11, 1995 FNBA loaned Christianson $28,000 to buy a lot on the hillside from Michael Cusack to construct a home. In March 1995, FNBA gave GALL a $300,000 loan. The money was used to pay off two $50,000 loans from Northrim and to purchase equipment needed for the business. Over the course of the next six months, FNBA made four more loans to GALL, GAN, and Titan Topsoil for operational purposes.

## B. The Bonnie Cusack Estates Subdivision Project

Cusack and Christianson, both hockey players, had known each other since high school. In 1995, Christianson was over at Cusack's house for a social function. Cusack had plans for the Bonnie Cusack Estates ("BCE") in plain view. This led to a conversation between Cusack and Christianson regarding the subdivision. There was peat on the property, and this fit with Christianson's topsoil business.

Although Christianson had some reservations about going into business with Cusack because of Cusack's less than sterling reputation, this did not dissuade Christianson from buying into the BCE project.

McGrew did not bring the BCE project to Christianson, nor did McGrew advise Christianson to invest in the project. Those decisions were made by Christianson. After his decision to get involved with Cusack in BCE, he sought out McGrew for a loan.

Christianson talked to McGrew to borrow money to purchase a one-half interest in Simpson Tract A, the land that would be developed into BCE. In late 1995 McGrew loaned Christianson $150,000 for that purpose. At the time that Christianson purchased his 50% interest in Simpson Tract A from Cusack, the property had a fair market value of approximately $700,000, net of a previous seller's mortgage on it. Christianson's 50% interest had a value of $350,000.

Christianson acquired about $200,000 of instant equity, which more than doubled his investment of $150,000. In return, Christianson committed to Cusack to manage the development of BCE.

In late 1995 Christianson and Cusack formed GDI to develop BCE. The delineation of responsibility is not clear, but generally the partners agreed that Cusack would have the responsibility for obtaining financing to begin the development of BCE, and Christianson through his companies would do the work. Cusack did obtain an initial $325,000 for GDI from McGrew in February 1996.

When McGrew consented to provide the initial financing for the development of BCE, he never expressly or impliedly promised Christianson that he would finance 100% of the cost to develop BCE, regardless of how much it would cost or how long it would take.

When Christianson and Cusack started the BCE project, they expected that the total revenue from the sale of the BCE lots would be about $4.2 million. The total cost for developing Phase I would be about $1.0 million due to the relatively high initial costs of extending water and sewer mains into the project under poor soil conditions. Developing Phases II and III would cost another $0.6 million. The total projected cost for Phases I, II, and III would be about $1.6 million, resulting in $2.6 million in net profits.

In 1996 Cusack and Christianson planned to minimize borrowing by using a phased development plan. They planned to complete Phase I and sell all of the lots by mid-1996 before proceeding to Phase II. Phase II would be completed and sold by mid-1997 and Phase III would be completed and sold by mid-1998. In this way the profits from an earlier phase would be used to finance a later phase.

Apart from Christianson having done some dirt work for another real estate developer, neither Cusack nor Christianson had any experience in developing

subdivisions. In 1995 GDI hired Richard Beese, a highly qualified civil engineer who had substantial expertise in local subdivision development to assist them in the planning, cost estimating, and engineering for the development of BCE. Although Beese did the planning for the project, it was up to Christianson to execute those plans.

Once the project started, Cusack essentially played no real role in the development of BCE. As the project evolved, Cusack rarely came on site, and Christianson was left with the responsibility of performing and overseeing the actual development work.

Christianson decided to do all aspects of the work himself for Phase I of the project in 1996. Phase I was a disaster, as the project was very badly managed. There was no schedule, proper organization, management, accounting procedures or suitable equipment. Before long the project was over budget and behind schedule. Beese recommended that GDI hire Bill Turner, who had extensive local subdivision development management experience and expertise to manage the remainder of development of BCE Phase I for GDI. GDI hired Turner to manage the development of BCE Phase I for only five months between January 1997 and May 1997. For a variety of reasons, including GDI's ability to pay, Turner's tenure ended. Unfortunately, after Turner's departure, Christianson again took over management and work on the project.

Phase I was completed by the end of 1997 for a cost of about $1.5 million. This was 50% more than the cost that was originally projected for Phase I and the project was more than a year and a half behind schedule.

Developing BCE posed many challenges, such as poor soil conditions and the technical difficulty of running utility lines approximately 2000 feet to the subdivision. GALL and TT, managed by Christianson, were primary contractors for the project. Neither GALL nor TT had the requisite expertise, experience, management, supervision or equipment to perform such tasks in an efficient and cost-effective manner.

The project was well beyond Christianson's experience and abilities, as landscaping work is very different from underground utility construction. Christianson did not have either the skills or the heavy equipment necessary to do the job, yet he did not outsource the work.

The same problems that plagued Phase I continued into Phases II and III. BCE Phase II was completed by GDI with substantial additional cost overruns by the end of 1998, and BCE Phase III was completed with substantial further cost overruns by the end of 1999.

The first of the BCE lot sales closed in the latter part of 1998, and the final BCE lot sales closed in late 2001. By the time the last of the BCE lots had been sold in late 2001, GDI had incurred about $5.4 million in total costs in developing BCE and carrying the lots. This resulted in a loss of about $0.3 million, rather than the $2.6 million in profits initially projected for the development.

## C.    Financing The BCE Project

The next section will discuss the loans that McGrew/FNBA and KeyBank provided to Cusack and Christianson during the time of the BCE project.

As discussed, on September 13, 1995, FNBA loaned $150,000 to GALL. Though the loan memorandum written by McGrew and agreed to by Christianson stated that the money was to be used to meet payables, the money was used by Christianson to pay Cusack to buy into the BCE project. McGrew wrote and Christianson accepted the loan for only a forty-five-day term. This led to a series of revolving loans.

The September 13, 1995 loan to GALL was repaid on October 24, 1995, out of another forty-five-day loan for $250,000 to GALL. The loan was granted ostensibly to meet payables. The October loan was repaid on January 12, 1996, out of another forty-five day loan granted to GALL, this time ostensibly to purchase equipment.

In turn, the January loan was repaid on February 9, 1996, out of a four-year

loan in the amount of $325,000 granted to GDI on February 8. Out of the loan of $350,000, $201,000 was used to pay off the January loan.

Instead of obtaining long-term financing for Phase I through 1996 and most of 1997, Christianson applied for and FNBA provided a series of rolling short-term loans and extensions. The loans were used mainly to repay previous loans, leaving only a fraction of the loans to pay for developing BCE.

Instead, Christianson and the plaintiffs did the work for BCE but they were not paid, as there was no money to pay them. For example, in May 1997 GALL was owed over $300,000 for its work on the project.

Around September 1997, Cusack and Christianson sought and obtained a loan for GDI from KeyBank for the development of BCE Phase II in the amount of about $1.3 million, which was secured by a first deed of trust on all of BCE. As between Christianson and Cusack, Christianson decided who would be paid with monies borrowed from KeyBank, as McGrew had no control over the disbursement of the KeyBank loan.

Between February 1996 and March 1999 McGrew and KeyBank together loaned GDI, Christianson, and Christianson's other companies working on BCE between $2.0 and $2.3 million for the development of BCE Phases I and II. This exceeded the initial $1.6 million total cost projection for BCE Phases I, II, and III.

Due to substantial disagreements between them, Christianson bought out Cusack's BCE interest in GDI in March 1999. Early on, Cusack had stopped active participation in the project and was absent and often out of state. There was also a dispute between the partners about who got paid and in what amount. Christianson wanted to be paid for his work. Cusack, however, insisted he be paid the same as Christianson even though he was not doing any real work to advance the project.

In 1999 the partners decided to part ways. After some negotiations, it was

decided that Christianson would buy out Cusack's interest in the project for $200,000. With Christianson's initial buy-in of $150,000, and the final buy-out payment of $200,000, Christianson paid Cusack $350,000 in cash. The money to buy out Cusack was borrowed from FNBA.

In addition, Cusack also received two lots from BCE, one for his manager and one for his sister. Christianson received one lot for his manager. Based on the prices of the lots sold to Hultquist Homes, each lot was worth $49,500. In all, Christianson paid Cusack $439,000 for the entire BCE development.

After that buy out, McGrew loaned GDI, Christianson, and Christianson's other companies over $3.0 million to complete the development of BCE.

After all the lots were sold, the sale proceeds went to repay loans or development expenses. The June 9, 2000 closing statement shows that approximately $236,500 went to the seller. However, GDI's bank statement for that month shows that the deposit received on that date was subsequently disbursed through unidentified "miscellaneous debits" from the account to pay existing loans.

Of the $1,304,319 received from Hultquist Homes at the last closing on September 14, 2001, approximately $1.265 million went to repay loans and $35,000 went to repay an obligation of GDI. GDI received $13.

After the last BCE lots were sold and the proceeds directed to various loan repayments, Christianson and plaintiffs still had nine outstanding loans with FNBA totaling more than $900,000. Instead of generating a profit, BCE ended with a $300,000 loss. In addition, Christianson borrowed the money to buy BCE from Cusack.

GDI owed more than $430,000 to GALL and TT for work done on the BCE project.

Plaintiffs also accrued hundreds of thousands of dollars in payroll tax penalties and interest to the IRS.

**D.      The Relationship Between Plaintiffs (Christianson) And McGrew**

The following findings deal with the relationship between Christianson and McGrew.  Their relationship served both their individual needs, but it was highly dysfunctional commercially.  It appears that very early on in the BCE project Christianson lost financial control of the project and turned to McGrew for help.

When Christianson went into business with Cusack to develop BCE he had CPAs Art Timm and Mary Mason available to provide him with advice.  Christianson's attorney John Tindall legally represented both Christianson and Cusack in forming and organizing GDI. Christianson and Cusack conveyed Simpson Tract A to GDI to initially capitalize GDI.  Christianson had professionals available to him during his involvement in BCE.  It does not appear that he sought out or followed their advice.

After entering into the BCE project, with overly optimistic projections and without long-term financing at the outset, Christianson and plaintiffs were confronted with the inability to meet their loan payments and other obligations.  Christianson really did not have any plan or failed to come up with any plan to address the mounting debt problems. Christianson sought out McGrew to handle his business finances, with the understanding that McGrew would keep the FNBA loans out of default.  Christianson would bring the bills he had to pay to McGrew, and let McGrew decide which ones would be paid. This was not a one-way street.  Christianson was a willing participant, as long as McGrew kept writing loans and renewing loans.  McGrew was willing to write the loans to cover other loans, as long as he controlled what was paid, taking care of FNBA's position and in the process, protecting his own reputation with the bank.  Just as the plaintiffs did not want their loans to go into default, neither did McGrew. McGrew made what was known as "character loans," based on the character and standing of the borrower.  Christianson's inability to pay his substantial loans would call into question McGrew's judgment.  To this extent, Christianson and McGrew had a common interest

and a symbiotic relationship. This continued even after it was clear that plaintiffs were no longer credit- worthy.

McGrew employed a number of strategies to address plaintiffs' mounting financial problems. As one means of managing plaintiffs' difficulties, McGrew and FNBA wrote plaintiffs 110 different loans over an approximate ten-year period, beginning with the September 1995 $150,000 loan to GALL. Counting extensions, the bank gave plaintiffs almost 250 loans during that period. Almost all the loans and extensions were for very short terms, mostly from thirty to sixty days.

The loan to GDI was extended eleven times, effectively extending a sixty-day loan into a thirty-one-month loan. FNBA has admitted that the only purpose for rolling and extending loans in this fashion would be to cover up credit being extended to borrowers that were not creditworthy.

McGrew kept plaintiffs' loans out of delinquency status for years. As a result of the rolling loans and extensions, plaintiffs' loans were identified as delinquent by the bank only four times prior to McGrew's death in December 2004.

Regardless of Christianson's protestations at trial, he had actual knowledge of what was going on as he signed for the loans and the extensions.

Counting the unique loans alone (i.e., without extensions), FNBA loaned plaintiffs a total of $15,170,826 over the ten years. This scheme and understanding between McGrew and Christianson could have gone on indefinitely. Unfortunately, McGrew passed away.

Given the number of loans and extensions and their short terms, tens and hundreds of thousands of dollars of loan payments were coming due every month. McGrew directed how the loan monies would be disbursed. McGrew primarily used the loans to repay previous loans, and McGrew otherwise decided which bills could or could not be paid from the loan funds and from plaintiffs' accounts.

Christianson spoke or met with McGrew on an almost a daily basis to discuss Christianson's finances, businesses, and the obligations that were coming due. Christianson sought and followed McGrew's advice regarding what he had to pay and whom he had to pay.

Sometimes, McGrew would have Christianson bring in a specific number of checks from each of his companies and would then tell him which bills to pay with them. Other times, when Christianson would come in to discuss his finances, McGrew would direct him to get counter checks from the bank lobby and tell him whom to write them to and on which accounts.

Because there was insufficient money to pay all of plaintiffs' obligations, McGrew would review the checks as they came through the bank and decide which checks to honor and which to bounce. Christianson also did not keep close track on the checks that he had written and the money that had been disbursed from his accounts. At times, Christianson wrote checks believing there were sufficient funds in the accounts to cover them, and the checks would bounce. As a result Christianson and his companies incurred a total of $53,163 in overdraft fees from 1996 through 2003.

Christianson did not have any system in place to keep proper track of his finances. In addition the bank recorded many disbursements in the bank statements only as "miscellaneous debits." Christianson and his bookkeepers could not tell where the money had gone.

Both Christianson and FNBA commingled plaintiffs' finances with one entity loaning money to another entity to pay the loans and obligations of other entities.

Although Christianson may not have known the specific details of each transaction, he was fully aware of what was going on, and he participated fully with McGrew, who was acting with his knowledge and approval. There is no question that Christianson received the bank statements and signed and received a copy of a written

loan disbursement authorization that tracked such disbursements. Christianson chose to keep a blind eye to what was going on. Plaintiffs knew such debits and disbursements were occurring and they willingly and knowingly allowed them to continue with McGrew.

McGrew did not give Christianson investment advice; rather, he found some deals for Christianson to engage in so that certain loans could be repaid. McGrew used his various clients on an ongoing basis, for each to "assist" the other, with the objective of not letting FNBA loans default.

Throughout the course of Christianson's relationship with the bank, McGrew continued to work and continued to loan him money for further projects.

Immediately upon his death, the outstanding loans of Titan Topsoil went delinquent until Dan Cuddy granted it a consolidated loan in June 2005. GAN's loans also went delinquent two months after McGrew's death and remained so until the consolidation loan.

E.     **Plaintiff's IRS Problems**

During the development of BCE, Christianson did not pay payroll taxes to the IRS. When the BCE lots were sold, McGrew directed the payment of other loan obligations but not the company payroll taxes owed to the IRS. However, this was done with the consent of Christianson, as he was aware that the IRS obligations were not being paid and they were outstanding. Christianson did not direct that McGrew pay the IRS out of funds that were received.

The IRS obligations total about $1.6 million . . . .

When Christianson and McGrew discussed the IRS obligations, McGrew advised him to negotiate with the IRS to try to reduce the amount owed. McGrew did not promise that the bank would take care of the problem once Christianson had tried to work out a compromise with the IRS.

McGrew never promised or committed to plaintiffs that he would make any loans to them to pay any of their payroll taxes incurred during, or as a result of, the development of BCE.

Christianson attempted to negotiate a compromise with the IRS, but his efforts ultimately failed.

In 2001 plaintiffs retained tax attorney George Goerig to advise them on their payroll tax problems resulting from the development of BCE. Goerig continued to represent plaintiffs with respect to their payroll tax problems.

Despite having a tax attorney represent them since at least 1999, plaintiffs did not make any offers to the IRS to compromise their payroll tax liabilities until November 11, 2002, when they offered to compromise the payroll tax liabilities of GALL, GDI and GAN for less than 10% of their then total payroll tax liabilities. The IRS rejected the offer because plaintiffs then had sufficient equity in their assets to pay such payroll tax liabilities.

## F.    Plaintiffs' Other Deals With Loans From FNBA

During his tenure with FNBA, McGrew had established a practice of using one bank customer to help the troubled loans and financial problems of other bank customers. Prior to his death, McGrew had a complicated web of transactions and interrelated loans between various bank customers. In some instances, the bank lent money to one customer that was used to repay loans or other obligations of a second customer. In other instances, the bank would bring in one customer and lend money to another customer to develop real property. In still other instances, the bank would loan money to one customer to buy equipment from a second customer, the proceeds of which would then be used to repay the second customer's troubled loans and obligations. Much of this lending was granted to customers who did not qualify for the loans and whose

ability to repay was questionable. McGrew's purpose was to keep loans from going into default.

Christianson claims that McGrew promised to "make things right." Such a statement is vague, indefinite, ambiguous, and unenforceable.

This next section will examine the real estate transactions that plaintiffs were engaged in, financed in whole or in part by McGrew, that plaintiffs claim caused them damages. These transactions involve Haxby, Shelikof, Skyway Park, Oceanview Plaza, and Maui Lot 3. The first two, Haxby and Shelikof, involve loan commitments to purchase real property.

### G.    Haxby

On July 30, 2001 McGrew gave Christianson a letter addressed to Alaska USA Federal Credit Union, the owner of a parcel of real property known as Haxby Tract C. The letter stated,

> Please be advised that Gage Development, Inc., has been approved for financing for the purchase of property described as Haxby Trac[t] C, purchase price of approximately $1.3 million. Property will be purchased as is, where is, and financing will be able to close on or before August 30, 2001.

It is Christianson's position that McGrew's letter was a commitment not only to finance the purchase of the lot, but in addition to finance the monthly payments until the property was sold.

At that time, Christianson did not have the ability to repay the loans nor to make the monthly payments. The IRS assessed payroll taxes penalties and interest and recorded tax liens against Christianson in March 2001. Christianson's own banking expert testified that by then, Christianson was not creditworthy and was not

bankable. The letter did not state what level of financing Gage was approved for and whether it was for 100%.

McGrew told Christianson that he would have to bring a partner into the deal in order to get the loan. Christianson brought Hal Ingalls and Ron Smith in as partners, although Smith later dropped out of the deal. Ingalls had the money to repay part of the loan on a timely basis.

Christianson, Ingalls, and Smith formed RTH, LLC, and on September 28, 2001 FNBA gave RTH a $1,327,500 loan, and RTH purchased the Haxby property. The loan was at 8.5% interest with nine monthly interest payments due beginning November 15, 2001, and a final payment of $1,337,083.45 due on August 15, 2002. The loan was later extended.

RTH, LLC purchased Haxby Tract C on October 1, 2001 for $1,338,589. It sold the property on December 28, 2004 for $3,300,363. RTH's 2004 tax return shows a capital gain of $1,771,208. GDI realized half of the profit from the resale of the property, or $885,604.

Christianson claims he lost half of the profits from the deal when the property was later resold. This claim is unfounded, as he profited from a deal that he should not have received financing for in the first place. He would not have been able to make any profit had Ingalls and Smith not assisted him with the purchase.

## H. Shelikof

The Shelikof transaction in many ways mirrors the Haxby transaction. On April 12, 2004 McGrew gave Christianson a letter that provided in part,

> First National Bank Alaska has approved financing for Titan Enterprises, LLC for the purchase of property described as: Shelikof W2NW4SW4NE4. Purchase price is $479,000.00. Property will be purchased as-is, where-is.

It is Christianson's position that McGrew's letter was a commitment not only to finance the purchase but in addition to finance the monthly repayment until the property was sold.

At the time of this transaction, plaintiffs' tax troubles had not been resolved, and they were still a blight on plaintiffs' credit worthiness.

McGrew told Christianson that he needed to bring a partner into the deal, and again he brought in Ingalls. The bank insisted that the loan to purchase the property be in Ingalls' name alone. Christianson was not creditworthy, as he had IRS liens and could not qualify for a loan. On June 8, 2004 the bank loaned Ingalls $480,000 at 6% interest with a maturity date of December 17, 2004.

To implement the deal, Titan Enterprises assigned its interest in the property to Ingalls in exchange for an option to be a tenant-in-common on the property. Titan then assigned its option rights to CFLP, which exercised the option, thereby obtaining a half-interest in the property from Ingalls.

Ingalls purchased the Shelikof parcel on June 8, 2004 for $479,550. He sold the property on December 1, 2006 for $900,000. Schedule D of RTH's 2006 tax return shows a capital gain of $326,655 (sale price of $900,000 minus the cost of the property and other expenses of $573,345). CFLP realized half of the profit from the resale of the property, or $163,327. Christianson claims that he is entitled to the other half also.

In this transaction, McGrew with Ingalls allowed Titan Enterprises to purchase the Shelikof parcel. CFLP (as Titan's assignee) gained half the profits when the property was resold. As with the Haxby transaction, McGrew's loan to Ingalls allowed Christianson to profit from a transaction that he was unable to finance because he was not credit-worthy.

In both these transactions, Christianson knew what McGrew's terms were, that he had to bring in a partner and share the profits. If Christianson did not like the

terms, he should have declined McGrew's conditions and sought financing elsewhere.

I.    **Skyway Park**

In this transaction, Christianson asserts that McGrew directed plaintiff CFLP to sell a parcel of property (Skyway Park) to Kaylen LeBaron. CFLP purchased the property for $284,000 on October 20, 2003, then immediately sold the property on that same date to LeBaron's company, Prestige Homes, for $389,000 for a $105,485 profit. Christianson asserts that this was much less than its market value. However, Christianson did not provide any evidence at trial of market value at the time he sold the property to LeBaron.

After LeBaron purchased the property, McGrew approached Lee Baker, Sr. about buying it from LeBaron. The bank loaned Baker $900,000 to purchase the property. Baker was led to believe that twenty-six homes could be built on the property, not four. However, the homeowners' association disagreed and took Baker to court.

Christianson asserts that Baker was later able to sell the property in June 2005 for $825,000 to a church. Because McGrew required CFLP to sell the property for less than it was worth, it was deprived of the market value of the property. Deducting for property taxes and loan-carrying costs at 6.5% interest, CFLP claims damages of $395,262 ($825,000 sale by Baker minus $389,000 sale by CFLP minus taxes and carrying costs of $40,738).

In reality, Baker did not fare very well in the transaction. The Superior Court granted the homeowners' association's appeal and invalidated the proposed replat, thereby allowing the construction of only four homes on the property instead of twenty-six. Christianson clearly did not account for the two years of legal and other expenses incurred by Baker.

The bank sued Baker to collect on its loan and foreclosed on the property and it obtained a judgment against Baker for $962,801. It appears that Baker lost money

on the transaction.

Christianson made a handsome profit from the transaction, without bearing the risk of loss.

**J.     Oceanview**

GDI entered into an earnest money agreement to purchase the Oceanview Plaza (aka 12870 Old Seward Highway and Lot 2D Vander Hoek Subdivision) for $900,000. McGrew then required GDI to step aside from its earnest money agreement and sell its interest in the property to Azem Limani for $150,000.

Limani purchased the Oceanview Parcel for $1,000,050. After holding on to the property for four-and-a-half years, Limani later sold the property for $1,750,000. Christianson claims that because McGrew required Gage Development to sell the property for much less than it was actually worth, Gage suffered a loss of $700,000.

In the more than four years that Limani held the property, he invested time and money into it. When he bought the property, nine or ten of sixteen units were rented. He put a restaurant in three units, and initially until all units were rented out, he did not meet his carrying costs. He also invested about $80,000 to fix up the roof.

It was Limani's efforts, investments, and risk-taking over four years that resulted in a profit. There is no evidence that Christianson could have achieved the same result.

Again, there was no evidence at trial of the market value of the property at the time it was sold to Limani.

**K.     Maui Lot 2**

In 1999, Christianson sold his topsoil pit to Hal Ingalls to pay a note to FNBA that was coming due. The sale closed on November 12, 1999 for $190,000. No evidence was presented that the sale was at other than market value. At the same time, Ingalls granted Christianson an option to repurchase the property within one year, but

Christianson lacked the funds to exercise that option. This was during the same period of time that Christianson was developing and marketing BCE. As a result, he lost the property and has had to lease it back from Ingalls at rates ranging from $1,000 to $3,000 a month. Since the sale, Christianson has incurred rental costs of $223,000. Had he been permitted to keep the property, he would have incurred property taxes of $57,188 and loan interest of $109,760. Rental costs would have exceeded tax and interest costs by $56,052. The property now has an assessed value of $919,300.

Christianson asserts that had he been allowed to keep the property, he would have saved $56,052 in expenses and would have increased equity in the property of $729,300. As a result Christianson claims he has suffered total losses of $785,351.

Again this is a situation where Christianson argues that had McGrew provided him with an unlimited line of credit, he could have kept Maui Lot 3, continued with his other projects, and made all the money. Christianson's fanciful thinking does not really comport with the reality of his financial situation, which was dire and kept afloat with unwarranted loans from FNBA.

L.    **Other Damages**

Fees, Interest, and Overdrafts. Plaintiffs are claiming $14,772.50 for all loan fees charged by FNBA. Plaintiffs are also claiming $1,120,450.59 for all interest charges paid on money loaned to them by FNBA. Plaintiffs are also seeking $53,163.53 in overdraft charges.

Tax, Interest, Penalties, and Attorney's Fees. As previously discussed, plaintiffs are seeking federal tax, interest, and penalties of $1,618,338, of which if paid, plaintiffs will be liable for 50% or $809,169. They seek their tax attorney fees of $68,688.59. There are also state taxes and penalties of $14,888.31.

Home Mortgage Interest and Late Charges. Christianson was unable to refinance the high interest loan on his family home to a rate in the range of 6.5% - 7.5%.

Based on a refinance rate of 7.5%, Christianson incurred interest charges of $159,145.35 from March 1999 when he unsuccessfully attempted to refinance with Vista Mortgage through September 2009. Christianson also incurred late penalties of $21,848.09 because of his financial situation and his inability to pay all his bills in a timely fashion. Around 1999, because of the BCE project, Christianson was really not bankable, and later on this was compounded by the tax liens. Even from the testimony of his own expert there is no showing that Christianson would have qualified for a lower interest rate.

Interest on the Aalfs Loan. Dan Aalfs is a "hard money" lender. This means Aalfs lends money at very high interest rates. In July, 2000 Christianson was not able to obtain financing from banks including FNBA at standard interest rates. Christianson borrowed from Aalfs, a private lender, at the high interest rate of 18%, secured by 8 lots in BCE. Interest charges on the $117,000 loan from Aalfs totaled $13,993. At the rate of 8%, interest charges would have been $6,227.

## M.    Prepayment Of Loans And Backhoe Transaction

This section will discuss deals made with loans from FNBA that benefited the plaintiffs. Plaintiffs knowingly and willingly participated in and accepted the economic benefits of each of McGrew's loans to McGrew's other customers that involved plaintiffs. Plaintiffs consented to McGrew's plans to keep the deals intact, to use McGrew's other customers to accept any loans from him and apply the proceeds from such loans to economically benefit plaintiffs.

Aaron Scott $200,000 prepayment. McGrew arranged for Titan Topsoil to accept $200,000 from Aaron Scott as prepayment for site work. The money apparently came out of an $800,000 loan the bank gave Scott. With reluctance, Scott agreed to the deal. Christianson initially agreed to the deal. Christianson testified that he then changed his mind, but McGrew deposited the $200,000 check from Scott in Titan Topsoil's account to repay a Titan Enterprises loan. Christianson did not explain how he intended

to pay the loan that was due without the infusion of $100,000 from Scott. Christianson then performed $11,132.50 worth of work and made some payments to Scott, leaving a balance owed of $170,000. Scott then sued Titan Topsoil, Christianson, and FNBA for the remainder. Titan and Christianson negotiated a settlement with Scott to accept $25,000 in full satisfaction of the balance owed. Christianson paid Scott $15,000. Under that settlement, Scott retains the right to seek payment of all amounts owed in the event Christianson fails to pay the $25,000. It is not clear whether Christianson/Titan Topsoil paid the remaining $10,000 owed under the settlement. Had he done so Titan/Christianson made $145,000 on the deal.

LeBaron $350,000 prepayment. McGrew required Kaylen LeBaron to loan Christianson $350,000, then used most of the money to pay down Christianson's loans. In return, Titan Topsoil was obligated to perform $350,000 of work on LeBaron's development projects. Through work and various other credits, Titan Topsoil repaid $219,170.50. It does not appear that Christianson intends to pay the remainder, or do additional work for LeBaron. Therefore, Christianson gained about $130,829 from the transaction.

The Backhoe. McGrew required LeBaron to buy a backhoe from Titan Topsoil for $250,000 and again used most of the money to pay down Christianson loans. The backhoe had a market value of about $ 50,000. This benefited Christianson in the amount of $200,000.

N.    **Property Flips**

A "flip" is a real estate transaction in which real estate or an earnest money agreement to purchase real estate is acquired and then simultaneously or shortly thereafter resold to a secondary buyer for a higher price. These are the transactions where the plaintiffs are not claiming any damages but where plaintiffs benefited from the deals set up and financed by McGrew.

The real property "flips" in which plaintiffs and McGrew were involved that resulted in a benefit to plaintiffs included Brittany Parcel $330,496 profit; A&C Properties $92,079 profit; Tudor Road $111,437 profit; Chirikof $20,000 profit; West 40th $88,356 profit; Brittany Rock $400,000 profit; and Independence Park $131,357 profit.

Adding all the profits from these transactions, plaintiffs made $1,173,735.

In addition, plaintiffs made $885,604 on Haxby; $479,000 on Shelikof; $105,485 on Skyway Park; and $150,000 on Oceanview. This adds up to $1,620,089. With the profits from the property "flips" plaintiffs made $2,793,824, nearly $2.8 million.

## O. McGrew's Death And The Aftermath

As previously discussed, when McGrew was alive, his interests and plaintiffs' interests were aligned in that both participants wanted the same result. Christianson needed loans to run his businesses and pay off existing debts. McGrew did not want his poor judgment and Christianson's delinquency to affect his reputation and status at the bank. He made some bad mistakes on loans to plaintiffs, and he continued that course, hoping that along the way, with enough financing on favorable terms, Christianson would be able to pay off all his loans. Indeed, given the amount of almost $2.8 million plaintiffs made on the property deals, there was enough money to meet the IRS and other debt obligations. The parties dispute whether overall plaintiffs are financially better off now than prior to their relationship with McGrew. This is really not a relevant inquiry, but if all the assets of CFLP are included in the analysis, Christianson has prospered from the relationship.

McGrew's plan might have succeeded had he lived long enough. After battling cancer for many years, McGrew died on December 21, 2004.

At the time of McGrew's death, Christianson and his companies were in financial trouble. In addition to other debts and obligations, plaintiffs owed the IRS $800,000 and they had outstanding loans to the bank of approximately $900,000.

After McGrew's death, Christianson continued his efforts to work with the bank, dealing directly with FNBA President Dan Cuddy. Cuddy told Christianson the bank could not lend him any more money because he had tax liens and was not creditworthy. Cuddy demanded that he repay his loans to the bank.

In February and March of 2005, the IRS tentatively agreed to a long-term payment plan in exchange for a $150,000 payment, but the IRS took the money, then revised the deal, though it lifted a few of the Titan Topsoil liens.

Christianson also paid $350,000 toward his outstanding bank loans.

The bank then consolidated plaintiffs' outstanding loans into a single loan to Titan Topsoil in the amount of $543,761, payable over five years. That loan was subsequently paid down, but payments were eventually suspended pending the outcome of this litigation.

As a condition of granting that loan, the bank proposed that Christianson sign a blanket release, absolutely and forever discharging the bank from any and all claims arising out of the bank's making, administration, or enforcement of the loans being consolidated, but Christianson refused to sign it. The bank granted the loan nonetheless.

Apart from the consolidation of existing indebtedness, FNBA refused to grant plaintiffs any additional credit. It does not appear that plaintiffs can get commercial loans elsewhere.

The Consolidation Loan has been duly accelerated by FNBA and is presently due and owing in its entirety in the principal amount of $335,245.22, plus

(a) accrued interest through August 1, 2009, in the amount of $32,183.54 and (b) daily accruing interest thereafter in the amount of $73.48 per day.

The Consolidation Loan Guaranty obligates plaintiffs to pay FNBA the (a) the unpaid principal balance of and all accrued and accruing interest on the Consolidation Loan Promissory Note and (b) all of the actual attorneys' fees and legal and expert costs that FNBA incurs in (I) defending against plaintiffs' claims in this case, (ii) pursuing its counterclaims to (A) collect on the Consolidation Loan Promissory Note, (B) enforce the Consolidation Loan Guaranty, (C) enforce the Consolidation Loan Security Agreement, and (D) realize on the Consolidation Loan Collateral.

. . . .

### Q. Todd Christianson's Credibility

Much of this trial turns on the testimony of Christianson, since McGrew is deceased. This court finds Christianson lacking in credibility in many aspects of his testimony at trial. Christianson had many glaring gaps in his memory, and he testified many times that he "could not recall." Yet he had remarkable recall and clarity in what McGrew said to him, even the exact words McGrew allegedly said to him. Much of his testimony was self-serving.

What is remarkable is that he did not recall many details of a number of deals in which he engaged. This is in contrast, for example, to the testimony of Kaylen LeBaron, who knew what deals he made, how much money was involved, and what he received in the end; what was the profit and what was the loss.

This court is left with the conclusion that Christianson had a far better understanding of what was going on, had the advice of professionals, appreciated the risks that were involved, and was certainly willing to go ahead with the deals, wanting to reap the rewards but wanting to negate any losses.

Further, Christianson's demeanor at trial was unpersuasive. He was evasive

under cross-examination, refused at times to answer straight-forward questions, and was inconsistent in his answers.

In addition, Christianson blames McGrew for the problems in BCE and essentially sees McGrew as the cause of all his problems. This court concludes that the BCE fiasco was really not the fault of McGrew, and he was not a substantial factor in causing the failure of BCE. Rather it was Christianson's incompetence, ineptitude and hubris that led to the project's failure. Christianson's failure to accept any responsibility further damaged his credibility.

## II.    CONCLUSIONS OF LAW

### A.    Introduction

Plaintiffs have raised numerous theories of liability. Before reaching the specific theories, some preliminary issues will be addressed, such as standing and McGrew's apparent or actual authority.

The causes of action by the plaintiffs will then be addressed, followed by the affirmative defenses raised by defendant FNBA.

Lastly, defendant's counterclaims will be discussed.

### B.    Plaintiffs' Standing To Assert Claims On Behalf Of GALL And GAN

GALL and GAN, corporations organized under Alaska law, were involuntarily dissolved prior to the bringing of this action.

Under AS10.06.678(a), "a dissolved corporation does not continue to exist for the purpose of continuing business," but it does continue to exist "for the purpose of winding up its affairs," including the collection of obligations and assets. Paragraph (d) of that section provides, "The directors of the corporation on the date of its dissolution...shall exercise and enjoy the powers necessary to act under the terms of this section."

Christianson was the sole director of GALL and GAN at the time of their

dissolutions. Pursuant to AS 10.06.678(d), he has the authority to prosecute the claims held by those corporations.

Alternatively, pursuant to AS 10.06.633(g), CFLP has the power to assert the claims by virtue of implied assignment. In *Alaska Continental, Inc. v. Trickey*,[1] the Alaska Supreme Court held under former AS 10.05.519(f) — current AS 10.06.633(g) — that the claims of a dissolved corporation were impliedly assigned first to the shareholders of the dissolved corporation then to a new corporation formed by those same shareholders.[2] Both the former and current laws provide, "An action arising out of a contract assigned by a corporation dissolved under this section may be brought in the name of an assignee."[3] In doing so, the Court reasoned that parties who breach contracts should not be able "to take advantage of a lapsed firm."[4]

Christianson was the sole shareholder of GALL and GAN. Prior to their dissolutions, he assigned all his property, including his shareholder rights, from himself in his individual capacity to himself as general partner of CFLP. As the sole shareholder of GALL and GAN at the time of their dissolution, CFLP now holds those claims by implied assignment.

During the period covering this lawsuit, Christianson was the sole decision-maker for plaintiffs. He knowingly and willingly intermingled their assets and disregarded their respective limited liability company/corporate/limited partnership veils for purposes of their dealings with FNBA, McGrew, and McGrew's other loan

---

[1]     933 P.2d 528 (Alaska 1997).

[2]     *Id*. at 531-32.

[3]     *Id*. at 531 (quoting former AS 10.05.519(f); AS 10.06.533(g)).

[4]     *Id*. at 532 n.2.

customers.  Similarly, McGrew treated the plaintiffs as all one entity, belonging to Christianson.  McGrew and FNBA used Christianson's various business entities as a means of banking with him as an individual. FNBA commingled assets and obligations between them and FNBA treated them as mere alter egos of Christianson. Since both parties did not honor the corporate form, neither party can hide behind that form as a means of avoiding liability or fault.

. . . .

### D.    Breach Of Contract

As both account holders and borrowers, plaintiffs entered into contractual relationships with FNBA.  These are governed by express terms of the accounts, promissory notes, and other written documents.  Plaintiffs are not alleging that express terms of the contracts between the parties have been breached.

Instead, plaintiffs claim that FNBA entered into additional verbal contracts and took on contractual duties during the course of the relationship between plaintiffs and McGrew, and then breached those contracts.

On these contract claims, plaintiffs must prove the existence of the contract by a preponderance of the evidence that the parties (1) expressed mutual assent to the terms (offer and acceptance) and (2) exchanged consideration.  In order to find the existence of mutual assent, both parties by words or conduct have reasonably indicated that they agreed on the terms.[5]

Ordinarily, mutual assent takes the form of an offer by one party and

---

[5]    *B. B. & S. Constr. Co. v. Stone*, 535 P.2d 271, 275 n.8 (Alaska 1975) ("a contractual obligation is created by expressions of assent"); *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281 (Alaska 1985) (A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe a contract had been entered.); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 19 comment a; 1 Corbin § 9, at 107.

acceptance by another party to whom the offer was directed. Unless otherwise indicated by the language used or by the circumstances, an offer may be accepted in any reasonable manner.[6]

Plaintiffs claim that the parties entered into the following oral or implied contracts:

a. Advising and inducing plaintiffs to invest in and participate in the BCE project.

b. Managing and controlling plaintiffs' accounts, finances, and businesses for the benefit of the bank and contrary to plaintiffs' best interests.

c. Requiring plaintiffs to pay other obligations in lieu of tax obligations.

d. Requiring plaintiffs to sell properties for less than their true value.

e. Lending plaintiffs money when they were not creditworthy.

f. Churning plaintiffs' loans by requiring them to take out multiple loans at the same time and loans with unreasonably short maturities.

g. Making payments to the bank and other obligors out of plaintiffs' loans and accounts, often without plaintiffs' knowledge or against their directions.

h. Bouncing checks and redirecting funds.

i. Violating applicable bank policies and procedures.

Considering each of these claims in turn, this court concludes that there was no contract between the parties regarding BCE. McGrew did not induce or advise Christianson/plaintiffs to invest in BCE. There was also no verbal contract that McGrew/FNBA would provide all the financing for BCE regardless of how much it would cost or how long it would take.

---

[6]     RESTATEMENT (SECOND) OF CONTRACTS §§ 29, 52 comment a; 1 Corbin § 77; accord for sale of goods, AS 45.02.206(a) [UCC 2-206].

There may have been some implied understanding that McGrew would assist Christianson/plaintiffs in figuring out how to pay off plaintiffs' loans and pay plaintiffs' bills. This was part of the complex relationship between McGrew and Christianson but it did not become an enforceable contract. It was more a situation of both parties acting in unison although each was pursuing their own self-interest. There was no contract where McGrew was charged with paying Christianson's bills or where he agreed to assume responsibility for Christianson's finances. Throughout this period, Christianson made decisions for the plaintiffs as to what work should be done, what contracts should be entered into, and what deals should be made. There is no evidence that McGrew took money for himself, kept the money, or in any way did not use the plaintiffs' money or loans from FNBA other than to satisfy Christianson's obligations. It may be that during this period, there were times that Christianson and the plaintiffs did not have sufficient money to meet all their financial obligations and this was the reason why certain debts, such as the IRS debt, remain to be paid. However, there is also evidence that Christianson/plaintiffs made certain choices, and during this period there was sufficient money to pay off a substantial portion of the IRS debt, but instead Christianson made financial decisions to expand his empire, such as buying a used car lot, or transferring assets and funds in CFLP. The IRS did not settle with Christianson/plaintiffs because the IRS concluded that plaintiffs could pay the taxes and interest owed.

Implicit in this breach of contract claim is that McGrew failed to loan plaintiffs all the money they needed, without reservation. This is implicit also in plaintiffs' "make things right" claims. Again these contract claims are without merit, as they are too vague, lack consideration, and are unenforceable.

In addition, there appears to be a claim that is the opposite of unlimited access to money, that McGrew/FNBA should have limited Christianson's borrowing.

Plaintiffs claim there were breaches of contract because McGrew should not have loaned them money because they were not creditworthy, and loaned them money in violation of banking policy, and was "churning loans." Again, there is no such contract. If there was any agreement between McGrew and Christianson, it was to loan plaintiffs as much money as feasible, regardless of whether plaintiffs were creditworthy, regardless of bank policy, regardless of the legalities of the transactions. The only lending limits appear to be McGrew's ability to avoid detection of plaintiffs' inability to pay the loans so that the scheme between the parties could continue. Such an agreement is against public policy and is unenforceable.

Even if there was an enforceable contract, there was no breach of contract. Christianson asked McGrew to continue giving him loans and to repay loans coming due, using the money plaintiffs had available. McGrew kept his part of the bargain.

Plaintiffs also appear to argue that part of the "investment advice" McGrew gave to Christianson and plaintiffs was for plaintiffs to benefit fully from all transactions – that McGrew breached the contract by requiring plaintiffs to sell property at less than full value. This court concludes there was no contract between the parties for McGrew to provide Christianson or the plaintiffs with investment advice. Although McGrew did set up some deals, there was no promise that McGrew would loan plaintiffs all the money necessary, without condition, so that plaintiffs would reap the maximum benefit from every transaction.

FNBA did not enter into a contract to loan all the funds necessary for plaintiffs to purchase Haxby Tract C and the Shelikof parcel. In both cases, letters were written to third parties that one of the plaintiffs had been approved for financing for the purchase of property. Nothing in the letters suggests that there would be no additional terms, such as requiring a creditworthy participant such as Ingalls and Smith who could at least make partial payments on the loans.

Even if there were contracts and breaches of the contracts, plaintiffs must also prove by a preponderance of the evidence that as a direct and proximate consequence of FNBA's breaches of contract, plaintiffs suffered damages. Plaintiffs have to prove causation of damages in the form of loan fees, loan interest, overdraft charges, federal tax penalties and interest, attorney fees in dealing with the IRS, state tax penalties and interest, increased past and future mortgage interest, late charges on mortgage payments, increased interest on the Aalfs loan, and lost profits on Skyway Park, Oceanview Park, Maui Lot 3 properties, Haxby Tract C, and the Shelikof parcel.

Regarding the loan fees, loan interest and overdraft charges, plaintiffs have not proven by a preponderance of the evidence that those loans were not issued, that the loan fees were other than standard loan fees, and the loan interest was at market or even slightly more favorable than market rates. Similarly, regarding the overdraft charges, plaintiffs have not proven by a preponderance of the evidence that there were indeed overdrafts or that plaintiffs had sufficient funds to cover the checks when they were presented.

The federal tax penalties and interest, attorney fees in dealing with the IRS, and state tax penalties and interest were incurred by plaintiffs through their own actions and incompetence in the BCE project. The evidence does not prove that McGrew caused these liabilities.

Regarding the increased past and future mortgage interest on Christianson's home, late charges on mortgage payments, and increased interest on the Aalfs loan, plaintiffs have failed to prove by a preponderance of the evidence that McGrew caused the damages claimed. Christianson was not creditworthy and that is why he had to go to a "hard money" lender like Aalfs. Also this court has rejected the argument that McGrew was responsible for and caused the failure of BCE that in large part rendered Christianson not creditworthy.

As with the Shelikof, Haxby, and other real estate transactions, even when Christianson was not creditworthy, McGrew's loans allowed Christianson to profit from transactions that he was unable to finance from other sources. This court disagrees with the argument that Christianson should have kept 100% of all profits from the investments and work of others such as Ingalls, LeBaron, Baker and Limani, without doing the work or taking the risks. Given Christianson's lack of financial resources and business acumen, it is highly speculative that he would have had as much success as some of the others who either partnered with plaintiffs or took over the projects.

In addition, plaintiffs benefitted from property flips financed by McGrew, such as Brittany Parcel's $330,496 profit; A&C Properties' $92,079 profit; Tudor Road's $111,437 profit; Chirikof's $20,000 profit; the West 40th $88,356 profit, Brittany Rock's $400,000 profit; and Independence Park's $131,357 profit. Plaintiffs made approximately $1.2 million on those transactions, and including the Haxby, Shelikof, Skyway Park, and Oceanview profits adds another $1,620,089 to plaintiffs' ledger.

McGrew's lax lending practices did not cause plaintiffs injury. Instead, the continual infusion of loans allowed plaintiffs to remain in business and financed numerous property deals that made money. Plaintiffs have failed to prove by a preponderance of the evidence that FNBA breached any oral or implied contracts, causing plaintiffs damages.

This finding that McGrew's conduct did not cause damages should answer all the claims of liability brought by plaintiffs. This court concludes that plaintiffs have not proven by a preponderance of the evidence that McGrew/FNBA caused them any damages.

To be clear, this court is not in any way endorsing McGrew's conduct. Some of what he did was unethical and reprehensible. In the end, McGrew's conduct helped Christianson/plaintiffs.

Despite this, in an excess of caution, this court will address some of the remaining claims raised by the plaintiffs.

### E.     Breach Of The Implied Covenant Of Good Faith And Fair Dealing

In every contract, there is an implied covenant of good faith and fair dealing.[7] The implied covenant precludes a party from engaging in conduct that will defeat the purposes of the contract and ensures that "neither party will do anything which will injure the right of the other to receive the benefit of the agreement."[8] Claims for breaches of the implied covenant of good faith and fair dealing in contracts are enforceable only if the underlying contracts are enforceable, because no such enforceable covenant exists in the absence of a corresponding enforceable contract.[9]

Regarding plaintiffs' claims, this court has concluded that there was no contract, and therefore, there was no corresponding implied covenant of good faith and fair dealing. Accordingly, McGrew/FNBA did not breach the implied covenant of good faith and fair dealing.

In addition, as discussed in the section regarding breach of contract, McGrew did not cause plaintiffs any damages.

### F.     Breach Of Fiduciary Duty

In addition, plaintiffs claim that McGrew owed them a fiduciary duty and breached that duty to them. The relationship between a bank and its customers is

---

[7]     *Mitford v. Lasala*, 666 P.2d 1000, 1006 (Alaska 1983).

[8]     *Id.* (quoting *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1981)).

[9]     *Lettunich v. KeyBank Nat'l. Assoc.*, 109 P.3d 1104, 1110 (Idaho 2005).

traditionally a debtor-creditor relationship which does not impose a fiduciary duty on the bank toward its customers.[10]

To prove a fiduciary relationship between a bank and a customer, the customer must show there was a mutual understanding between it and the bank that there was a fiduciary relationship between them, as opposed to merely proving a subjective belief on the customer's part that there was one.[11] The relationship must be reciprocal and "it is not enough to show that plaintiffs reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship."[12]

"[A] fiduciary relationship may arise between a lender and a borrower where the lender gains substantial control over the borrower's business affairs."[13] "[C]ontrol entails evidence that the lender was involved in the actual day-to-day management and operations of the borrower or that the lender had the ability to compel the borrower to engage in unusual transactions."[14] "Moreover, action taken by the creditor to minimize risk does not constitute total and absolute control."[15]

Applying these standards, the court concludes that McGrew and FNBA did not assume fiduciary duties toward plaintiffs. McGrew's primary relationship with plaintiffs was to loan money to the plaintiffs and to ensure that the loans were paid. Over

---

[10]    *Faith, Hope & Love, Inc. v. First Alabama Bank of Talladega County, N.A.*, 496 So. 2d 708, 711 (Ala. 1986) (quoting *Baylor v. Jordan*, 445 So. 2d 254, 256 (Ala. 1984)); *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3rd Cir. 1988).

[11]    *In re Cara Corp.*, 148 B.R. 760, 772-73 (Bkr. E.D. Pa. 1992).

[12]    *Id.* at 773.

[13]    *Id.*

[14]    *Id.*

[15]    *Id.*

time, the relationship evolved regarding how the loans would be paid back, leading to the real estate deals and flips. When money was tight and when Christianson brought bills for McGrew to pay, the understanding was again to keep the loans from going into default, to keep the money flowing so that Christianson could continue with his ventures. Given some of the unusual transactions involved, such as the prepayment deal with Scott and LeBaron, and having Christianson bring in partners on Haxby and Shelikof, it is obvious that McGrew did not form a fiduciary relationship with plaintiffs. He was taking action to minimize the bank's risk, not Christianson's risk.

McGrew did not assume day-to-day control and management of plaintiffs' businesses. McGrew did not involve himself with the day-to-day running of operations of any of the businesses. Indeed, as has been discussed, it was Christianson who was in charge of the daily operations of BCE, and he was in charge of the management of the other enterprises as well. It would be a misnomer to call what McGrew did giving investment advice. It should have been clear to Christianson that taking care of him was secondary to McGrew taking care of the bank, upon which his reputation rested.

This court concludes that no fiduciary relationship existed between plaintiffs and McGrew.

. . . .

## H.    The Unfair Trade Practices And Consumer Protection Act

The Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") provides, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or business are declared to be unlawful."[16] AS 45.5.471(b) sets forth a non-exhaustive list of activities precluded by the UTPA.

---

[16]    AS 45.50.471(a).

"An act or practice is deceptive or unfair if it has the capacity or tendency to deceive."[17] Determination of whether an act is unfair requires consideration of a number of factors:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).[18]

The UTPA applies to unfair acts or practices in transactions between businesses as well as to unfair acts directed at consumers.[19]

A claim under the UTPA has two basic elements: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.[20]

The following acts and practices by a bank loan officer are  exempt under

---

[17]    *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980) (citation omitted).

[18]    *Id.* at 535.

[19]    *Western Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1053 (Alaska 2004).

[20]    *O'Neil Investigations*, 609 P.2d at 534.

the UTPA: (a) non-residential real estate lending and servicing,[21] and (b) real estate sales and purchases,[22]

This court has previously ruled that the UTPA does not apply to real estate loans. Applying this standard to the transactions here, this court concludes that such loans are exempt from the UTPA. Although the parties designated some of the loans for other purposes, the actual purpose of the loans from FNBA was for development of BCE, Haxby, Shelikof, Oceanview, Skyview, Maui Lot 3, Brittany Parcel, A&C Properties, Tudor Road, Chirikof, West 40th, Brittany Rock, and Independence Park. These loans are not subject to the UTPA.

However, given the sheer number of loans, it is difficult to track which loans were used for what purposes. Also, some loans were used for more than one purpose, and some of the money was used to finance plaintiffs' operational needs.

According to 12 CFR § 7.1002(b), a bank may introduce parties for purposes of transactions, but it must leave it to the parties themselves to negotiate and consummate the transactions. Plaintiffs allege that McGrew violated this regulation and that he misled and deceived Christianson into investing and participating in the BCE project. This court previously found that McGrew did not introduce Christianson and Cusack.

---

[21] *Barber v. National Bank Alaska*, 815 P.2d 857, 861 (Alaska 1991), *overruled on other grounds by St. Denis v. The Dep't of HUD*, 900 F. Supp. 1194 (D. Alaska 1995).

[22] *State v. First National Bank*, 660 P.2d 406, 413 (Alaska 1982). *See* AS 45.50.561(a)(9) (2004 amendment adding residential, but not commercial, real estate lending and servicing to AUTPA coverage; § 9, ch. 55 SLA 2004); court's January 13, 2009 Order on FNBA ARCP 12(b)(6) Motion.

Plaintiffs also claim that it was unfair that McGrew dictated the terms of property sales, requiring plaintiffs to sell properties for less than they were worth, thereby causing plaintiffs to lose the full value of those properties. Again, even if those transactions were unfair, plaintiffs have failed to prove causation of damages.

. . . .

This court concludes that FNBA did not engage in predatory lending practices and did not violate the UTPA.

## III.    FNBA Counterclaim Against Titan Topsoil: Promissory Note

FNBA seeks to collect upon the final consolidation loan granted to Titan Topsoil on June 22, 2005.

FNBA is entitled to recover the outstanding principal and interest on the loan. The Consolidation Loan has been duly accelerated by FNBA and is presently due and owing in its entirety in the principal amount of $335,245.22, plus (a) accrued interest through August 1, 2009 in the amount of $32,183.54 and (b) daily accruing interest thereafter in the amount of $73.48 per day.

## IV.    CONCLUSION

In summary, this court has rejected plaintiffs' theory that McGrew caused plaintiffs' financial woes by getting Christianson involved in BCE. This court concludes that it was Christianson, driven by greed, hubris, and inexperience that turned BCE from a highly profitable project into a financial disaster.

There is no doubt that McGrew was opportunistic in capitalizing on plaintiffs' financial distress. McGrew continued to loan plaintiffs money long after they were no longer creditworthy.

Both Christianson and McGrew participated in a scheme whereby plaintiffs' loans would not go into default. Both parties engaged in very questionable conduct that maintained plaintiffs' liquidity.

In the end, rather than suffering damages, plaintiffs benefitted from McGrew's largesse.

Accordingly, this court finds for the defendant and against the plaintiffs.

Dated this 9th day of April 2010 at Anchorage, Alaska.

/s/

_____

Sen K. Tan

Superior Court Judge